JAMES GRAHAM BROWN
FOUNDATION, INC.,
Appellant,

v.

ST. PAUL FIRE & MARINE INSUR-
ANCE CO., Fireman's Fund Insurance
Company, Continental Insurance Com-
pany, Indiana Insurance Company, and
U.S. Fire Insurance Company, Appel-
lees.

No. 90–SC–242–DG.

Supreme Court of Kentucky.

July 3, 1991.

As Modified on Denial of Rehearing
Sept. 26, 1991.

Lively M. Wilson, Stites & Harbison, Louisville, Mark R. Overstreet, Judith A. Villines, Stites & Harbison, Frankfort, for appellant.

Charles S. Cassis, Mark R. Feather, Brown, Todd & Heyburn, William S. Bowman, Stiles & Bowman, William D. Grubbs, Gregory Bolzle, Woodward, Hobson & Fulton, William A. Miller, Jr., Washer, Kaplan, Rothschild, Aberson & Miller, Louisville, Randy M. Mott, Robert T. Lee, Mott Pearce Williams & Lee PC, Lawrence E. Carr, Jr., Margaret H. Warner, Kyle A. Kane, Carr Goodson & Lee P.C., Washington, D.C., Daniel A. Bartoldus, Lawrence A. Levy, William M. Savino, Rivkin, Radler, Bayh & Hart & Kremer, Uniondale, N.Y., Scott J. Schwarz, Mattioni Mattioni & Mattioni, Philadelphia, Pa., for appellees.

Thomas W. Bruner, Marilyn E. Kerst, Stephen P. Keim, Wiley Rein & Fielding, Washington, D.C., F. Larkin Fore, Dan T. Schwartz, Mulloy Walz Wetterer Fore & Schwartz, Victor L. Baltzell, Jr., Miller Mosley Clare & Townes, Louisville, Dennis J. Conniff, Dept. of Law, Natural Resources and Environmental Protection Cabinet, Frankfort, William H. Allen, William F. Greaney, Covington & Burling, Washington, D.C., for amicus curiae.

WINTERSHEIMER, Justice.

This appeal is from a summary judgment in a declaratory judgment action which determined that comprehensive general liability insurance policies do not provide either indemnity for or a defense to the environmental claims against the insured.

The general issue relates to the availability of insurance coverage for environmental claims. This specific case involves whether comprehensive general liability policies of insurance purchased for wood preserving treatment plants provide coverage for the cleanup of environmental damage when ordered by a federal agency.

The James Graham Brown Foundation inherited from its benefactor sole ownership of stock in a corporation which owned three wood preserving treatment plants. These plants process utility poles and railroad ties to protect them from natural deterioration. The process involved injection under high pressure into the poles of either creosote or PCP. The plants were located in three different states, one in Louisville, Kentucky, one in Brownville, Alabama and another in Live Oak, Florida. All of the sites have significant environmental cleanup problems. The damage had been caused to the areas surrounding the plants due to waste water discharge, chemical spills and rainwater runoff.

The Foundation had fifteen general liability policies and fifteen excess policies from the insurers. All the policies provide that the insurance companies will indemnify the Foundation for "all sums which the insured will become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence." Each policy defines "occurrence" in essentially the same manner as:

> An accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.

Damage at the Live Oak location was such that the Federal Environmental Protection Agency ordered a cleanup pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, also known as CERCLA, pursuant to the Federal Superfund Legislation. Federal and state environmental agencies also warned of the possibility of such orders affecting the two other sites.

The Foundation sought coverage for the cleanup from the insurance carriers from which they had purchased comprehensive general liability insurance policies. Some of the insurers initially provided a defense for the Foundation but eventually all insurers withdrew their defense.

The Foundation filed a declaration of rights action in circuit court seeking to settle the separate questions of coverage for the cleanup and the duty to defend. In response to motions for summary judgment, the circuit judge ruled in favor of the insurance companies in regard to both the

coverage issue and the duty to defend. The coverage issue ruling was made on the basis of the application of the definition of "occurrence" as used in the policies. The circuit judge found that there was no covered "occurrence" because the operators of the processing plants were aware of the damage that was being incurred by the routine operations. The result was expected or intended because they knew of this damage and consequently there was no "occurrence" and no insurance coverage. The duty-to-defend issue was disposed of by stating that because the insurance companies owed no coverage on the damages, the companies could decide not to defend pursuant to *Cincinnati Insurance Company v. Vance,* Ky., 730 S.W.2d 521 (1987). The Court of Appeals affirmed the decision of the circuit court and this Court granted discretionary review.

A determination of whether the order from the environmental agency constitutes a loss within the policy term "damages" is not necessary in this case at this time as counsel for both sides conceded at oral argument under direct questioning by the Court.

The initial issue presented is whether the circuit court ruling granting summary judgment is in error because there were genuine issues of material fact. The primary question in this case relates to the availability of insurance coverage for environmental damage. Several other issues involve the duty to defend and the application of the holding in *Vance, supra,* as to whether a duty to defend is based on allegations in the complaint or upon the ultimate duty to indemnify the loss; whether an insurer may be held responsible for defense costs incurred prior to its actual withdrawal of the defense even though the insurance companies did defend under a reservation of rights; and a question in regard to the insurance companies' duty to act in good faith while conducting a defense under a reservation of rights.

We must first consider the summary judgment standard issue. The Court of Appeals and the trial court impermissibly acted as a finder of fact and concluded improperly that there was no genuine issue of material fact and that the Foundation expected and intended the alleged damage which resulted in the environmental claims.

■■■ The purpose of summary judgment and the standard to be used in reviewing such an action require that the procedure is designed to expedite the disposition of cases. The grounds for summary judgment are that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The circuit court is not authorized to render a summary judgment if there exists a material fact which requires a trial. The function of summary judgment is to terminate the litigation when it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor. It is proper where the movant shows that the adverse party could not prevail under any circumstances. Civil Rule 56.03; *Paintsville Hospital Company v. Rose,* Ky., 683 S.W.2d 255 (1985); *Steelvest, Inc. v. Scansteel Service Center, Inc.,* Ky., 807 S.W.2d 476 (1991). The only duty of the court on a motion for summary judgment is to determine whether there are genuine issues to be tried and not to resolve them. *Mitchell v. Jones,* Ky., 283 S.W.2d 716 (1955). The burden on an insurer is to demonstrate the absence of a genuine issue of material fact and any doubts about the propriety of summary judgment are to be resolved against the insurer. *Clifton v. Midway College,* Ky., 702 S.W.2d 835 (1985). Questions relating to the credibility of witnesses and the weight of the evidence must await trial. *Ogden v. Employers Fire Insurance Company,* Ky., 503 S.W.2d 727 (1973). Whether an insured intended the consequences of its action is normally a question of fact and not one of law. The determination of whether an insured expected or intended the damage resulting in the claim is for the jury. *Munzer v. St. Paul Fire & Marine Insurance,* 145 A.D.2d 193, 538 N.Y.S.2d 633 (1989). Determination of intent is normally inappropriate for summary judgment. *Wilson v. Seiter,* 893 F.2d 861 (6th Cir.1990). Summary judgment can be proper on any issue including state of mind

questions such as intent and expectation. Generally when any claim has no substance or controlling facts are not in dispute, summary judgment can be proper. In this case, the record indicates that there are substantial disputed areas of fact including the factual question of intent. The record does not compel only one reasonable inference.

██ Certainly the circuit judge is not absolutely prohibited from inferring on summary judgment that an insured intended or expected damage regardless of whether the objective or subjective test is used. In some cases, it is almost irrelevant whether an objective or subjective test is applied because of the circumstances. This case is not in such a posture, and summary judgment was inappropriate.

We recognize the difficulty of establishing the subjective intent or expectation which was the concern of the Court of Appeals. However, we believe the Court of Appeals has sanctioned error in its misplaced concern for the problems of proof.

In concluding that there was no genuine issue of material fact concerning the Foundation's expectations and intent, the testimony was impermissibly weighed and the evidence of damage was disregarded. The Foundation noted four areas of evidence indicating that it did not intend or expect the alleged damage to the ground water which gave rise to the environmental order. It is the threatened damage and not the deposits of the preservative on the ground, or the alleged pollution of surface water, which the Foundation must have expected or intended before coverage may be denied. *Grand River Line Company v. Ohio Casualty Company,* 32 Ohio App.2d 178, 289 N.E.2d 360 (1972). The activity which produced the alleged result may be fully intended and the residual effects fully known, but the damage itself may be completely unexpected and unintended.

██ As a result of the strict liability provisions of the environmental act, CERCLA, the Foundation may be responsible even though it operated the Louisville and Brownville locations for only nine of their 60 years of activity and owned the Live Oak facility for two of its 30 years. One who is statutorily vicariously liable for the intentional act of another cannot be denied coverage since the defendant does not possess the requisite intent to do injury. 1A R. Long, *The Law of Liability Insurance* § 5.06 at 5–54 (1990).

The real issue is whether the Foundation expected or intended all the damage for which the government now seeks redress. With some exceptions, the policies here do not involve an environmental exclusion clause as do some of the cases cited and relied on by the insurers. The question is not whether the Foundation contributed to the contamination. The Court of Appeals determined that it was undisputed that the managers of the corporation and its successor knew that pollution was occurring at all three plants between 1969 and 1980 and also knew of state environmental concerns about pollution and that therefore there was no genuine issue of material fact as to whether the Foundation expected or intended the portion of the pollution damage which occurred while it owned the plants.

A careful examination of the record indicates that board members and executives of the Foundation denied that they intended or expected harm from the waste discharges. The occurrence need not take place and no claim need be filed during the period the policy is in effect. An event that qualifies as an occurrence must either cause property damage or bodily injury during the period of time the policy is in effect. Pendygraft, Plews, Clark, and Wright, *Who Pays For Environmental Damage: Recent Developments in CERCLA Liability and Insurance Coverage Litigation?* 21 Indiana Law Review, 117 at 140. The insurer's responsibility under a comprehensive policy is not measured by its intent. The insured is entitled to all the coverage he may reasonably expect under the policy. Only an unequivocal, conspicuous and plain and clear manifestation of the company's intent to exclude coverage will defeat this expectation. *Simon v. Continental Insurance Company,* Ky., 724 S.W.2d 210 (1986); *Woodson v. Man-*

hattan Life Insurance Company, Ky., 743 S.W.2d 835 (1987).

In this case, the environmental authorities are not seeking damages for the deposit of the wood preservative, rather the claimed damage is the allegedly threatened discharge of substances into the ground water as a result of a deposit of the wood preservative. The threatened discharges are alleged to have begun with a deposit of the materials and continued through the insurers' policy periods.

The Foundation alleges that there were numerous accidental spills, leaks and discharges which contributed to the contamination at the three locations and ultimately gave rise to the environmental claims. These situations cannot be dismissed as "de minimis." The policies did not contain such a clause.

The direct evidence by reason of the plant managers' testimony as to the intent and expectations created a genuine issue of material fact and prohibited summary judgment. Evidence of improvements in the efforts by the Foundation to comply with changing environmental standards also creates a jury question.

We must now consider the definition of "occurrence" and its relation to policy exclusions. Under the definition of "occurrence" only damages expected or intended from the standpoint of the insured are excluded. The interpretation placed on this language by the circuit court and the Court of Appeals is clearly at variance with the plain language of the policy. The primary purpose of a comprehensive general liability policy is to provide broad comprehensive insurance. Obviously the very name of the policy suggests the expectation of maximum coverage. Consequently the comprehensive policy has been one of the most preferred by businesses and governmental entities over the years because that policy has provided the broadest coverage available. All risks not expressly excluded are covered, including those not contemplated by either party. See The Applicability of General Liability Insurance to Hazardous Waste Disposal, 57 S.Cal.Law Review 745 (1984).

■■ The term "occurrence" is more expansive than "accident" in that it can include losses and damage arising over a period of time from continuous or repeated exposure to conditions which would not qualify for coverage under the term "accident." 1 The Law of Liability Insurance R. Long § 1.21 at 1–88. Courts and commentators alike are in agreement that the term "occurrence" is to be broadly and liberally construed in favor of extending coverage to the insured. Buckeye Union Insurance Co. v. Liberty Solvent and Chemical Company, Inc., 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984).

■■ The Foundation is entitled to coverage under its policies unless it has specific and subjective intent to cause the pollution giving rise to the CERCLA claims. The "expected or intended" exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim. Partons–Oxford Mutual Insurance Company v. Dodge, Me., 426 A.2d 888 (1980). We believe this to be the majority rule, and we agree that if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable. While the activity which produced the alleged damage may be fully intended, recovery will not be allowed unless the insured intended the resulting damages. Cf. City of Johnstown v. Bankers Standard Insurance Company, 877 F.2d 1146 (2nd Cir.1989).

Partons–Oxford, supra, said that the intended clause excludes only harm that the injured in fact subjectively intended to be the result of his conduct or in fact subjectively foresaw as a practically certain or expected-to-be result of the conduct. Some courts have held that the term "expected" and "intended" are nearly synonymous, so that for all practical purposes a subjective intent to cause harm is what the insurer must prove to defeat coverage. See United Services Auto Association v. Elitzky, 358 Pa.Super. 362, 517 A.2d 982 (1986); State Farm Fire & Casualty Company v.

*Muth*, 190 Neb. 248, 207 N.W.2d 364 (1973); *Grange Mutual Casualty Co. v. Thomas*, Fla.App., 301 So.2d 158 (1974). Many of the courts in this nation have adopted the subjective test because of the exact language of the provision of the policy and the context of the policy as a whole.

The proper standard for the analysis of insurance contracts in Kentucky is a subjective one. *Fryman v. Pilot Life Insurance Company*, Ky., 704 S.W.2d 205 (1986) holds that terms of insurance contracts have no technical meaning in law and are to be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. The policies here state that the insurer has a duty to indemnify or defend the insured for damage if the damage was neither expected nor intended from the standpoint of the insured. They do not say from the standpoint of a reasonable person. The policies do not define "expected" and "intended" but those are common words and they clearly indicate subjective awareness. *Fryman, supra*, requires that insurance contracts be construed according to the usage of the average person without injecting any other analysis or standard.

In considering this situation, we must reject the objective or foreseeability standard used by the Court of Appeals. A review of the decisions in other states indicates that those courts have not applied the objective standard used by the Court of Appeals for three principal reasons: the language of the exclusion, reasonable expectations of the insured and the inappropriateness of injecting tort principles into the construction of insurance contracts.

Kentucky has consistently recognized that an ambiguous policy is to be construed to effectuate the purpose of indemnity, *Wolford v. Wolford*, Ky., 662 S.W.2d 835 (1984), and where not ambiguous, the ordinary meaning of the words chosen by the insurer is to be followed. *Washington National Insurance Company v. Burke*, Ky., 258 S.W.2d 709 (1953).

Under the doctrine of reasonable expectations, it has been held that it cannot be accepted as a fact that the parties in good faith intended to bargain for insurance that paid no benefits. *Simon, supra; see also Home Folks Mobile Home, Inc. v. Meridian Mutual Insurance Company*, Ky.App., 744 S.W.2d 749 (1987); *Moore v. Commonwealth Life Insurance Company*, Ky. App., 759 S.W.2d 598 (1988). *Cf. Woodson v. Manhattan Life Insurance Company*, Ky., 743 S.W.2d 835 (1987).

Reliance by the Court of Appeals on *Willis v. Hamilton Mutual Insurance Company*, Ky.App., 614 S.W.2d 251 (1981) in resolving this case is misplaced. The effort to distinguish *Willis, supra*, from *Fryman*, is unsatisfactory. As we have stated, the use of the objective standard is rejected, and it cannot be used to measure a subjective state. In this situation *Fryman* gives the chosen language of the insurers its plain meaning.

We now turn to the issue of the insurers' obligation to provide a defense to the environmental claim. The insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage of the policy. *O'Bannon v. Aetna Casualty and Surety Company*, Ky., 678 S.W.2d 390 (1984). The insurance company must defend any suit in which the language of the complaint would bring it within the policy coverage regardless of the merit of the action. *Wolford, supra*. The determination of whether a defense is required must be made at the outset of the litigation. *Knapp v. Chevron USA, Inc.*, 781 F.2d 1123 (5th Cir.1986). The duty to defend continues to the point of establishing that liability upon which plaintiff was relying was in fact not covered by the policy and not merely that it might not be. 7C Appelman, *Insurance Law and Practice* § 4683.01 at 69 (Berdal Ed.1979).

The duty to defend is separate and distinct from the obligation to pay any claim. *Wolford*. The Foundation obtained the right to a defense by purchasing the comprehensive policies. The defense

clause in the policy contract is a contractual right of the insured for which he has paid a premium, and the duty to defend is broader than the duty to indemnify. *Wolford. Vance, supra,* does not compromise the obligation to defend. *Vance* decided the separate question of whether an insurer's breach of duty to defend estops it from later litigating its obligation to indemnify. This Court narrowly viewed the question presented in *Vance.* We did not attempt to define the duty or limit an insured's right to recover its cost of defense to only those instances in which the insurer was obligated to indemnify the insured. This Court addressed the distinct and separate question of whether an insured's failure to meet its duty to defend prevented a later attempt to litigate the coverage question. Nothing in the *Vance* decision supports the conclusion that the policyholders are stripped of a significant part of the protection purchased by their premium dollars. The case merely restates the long-standing principle that an insurer which breaches its duty to defend and who is subsequently determined to owe a duty of indemnity must pay the judgment.

Here the refusal of the insurance companies to defend the Foundation has forced an extraordinary burden on the Foundation. Insurance law should apply equally to those who are capable of absorbing such a burden as well as to those who are not. The vast majority of Kentucky insurance policyholders are not able to accept such a burden, and it may well be that they are unable financially to defend a claim and prosecute an action on the policy. The doctrine of reasonable expectations remains a viable one in Kentucky.

■ The insurers, St. Paul, Fireman's Fund, Continental and U.S. Fire; did not abide by their independent duty of good faith and fair dealing even if they were not obliged to defend or indemnify the Foundation. When dealing with its insured, the insurance company has the obligation to exercise the utmost good faith. *O'Bannon, supra.* It is our view that the Court of Appeals attempted to restrict the duty of good faith to only those instances where an insurer has a duty to indemnify and thereby to limit any cause of action for its breach to failure to pay according to the contract. Such an interpretation does not provide the Foundation with a reasonable means to insure prompt and bargained for compensation as noted in *Curry v. Fireman's Fund Insurance Company,* Ky., 784 S.W.2d 176 (1989).

The Foundation argues that for five years they've had the responsibility of defense expenses of approximately $500,000 which they claim the insurers had agreed to pay pursuant to the policy.

St. Paul, Continental and U.S. Fire were obligated under the terms of their policies with the Foundation for its defense costs during the period they defended the Foundation under a reservation of rights. If the insurer agrees to contribute to the expense of the insured's own defense against a third-party claimant, the agreement is binding. 14 G. Couch *Cyclopedia of Insurance* § 51.96 at 596 (Rev.Ed.1982). The decision of the Court of Appeals releasing the insurers from their obligation is not supported by persuasive law. The insured is entitled to all the coverage he may reasonably expect under the policy. *Simon.* The Foundation, having purchased the policies and having permitted the three insurers to defend it under a reservation of rights, may reasonably expect that the insurers will abide by the contract.

The Court of Appeals confused two different questions. The issue of whether the standard is subjective or objective is distinct from the issue of the kind and quality of the evidence that will prove subjective intent or expectation. A subjective standard does not prevent circumstantial evidence of expectation or intent. The traditional solution for such a problem is a jury instruction that the trier of fact may determine the credibility of the parties based on all circumstantial factors.

State of mind issues such as intent and expectation are generally inappropriate for determination at the summary judgment stage because their resolution depends on weighing all the evidence and drawing permissible but not required inferences.

Whether the Foundation subjectively expected or intended the property damage is a factual question for the trier of fact and not a matter to be decided from drawing inferences from an untested discovery record on a motion for summary judgment. *Cf. Shah v. American Synthetic Rubber Corp.*, Ky., 655 S.W.2d 489 (1983).

The decision of the Court of Appeals is reversed and this matter is remanded to the circuit court with directions to vacate the summary judgment and require the insurers to pay for defense and indemnity unless they can prove that the insured subjectively expected or intended the property damage.

STEPHENS, C.J., and COMBS, LAMBERT and SPAIN, JJ., concur.

LEIBSON, J., files a separate opinion concurring in part, dissenting in part, in which REYNOLDS, J., joins.

LEIBSON, Justice, concurring in part/dissenting in part.

I agree with the main premise in the Majority Opinion. The trial court erred when it decided to grant summary judgment on grounds "there was no occurrence and therefore no coverage." The case should be reversed and remanded on this issue.

But, respectfully, the Majority Opinion paints with too broad a brush with respect to some of its reasoning, which obliges me to state my views separately and to dissent from certain portions of the Opinion.

As a general proposition, where not otherwise excluded by a specific pollution exclusion clause, the term "occurrence" as used in the standard Comprehensive General Liability ("CGL") policy is broad enough to include environmental pollution liability. When adopted in 1966 the new CGL revised standard policy changed from accident-based coverage to occurrence-based coverage and defined "occurrence" so that it is no longer necessary for the event causing the injury to be sudden or accidental in character. Injuries which take place over a long period of time, which are cumulative in nature, even though not accidental (so long as the *results* are not intentional), are covered by the language of the insurance contract. As stated in *Mealey's Litigation Reports, Ins.*, Vol. 4: No. 28, Oct. 30, 1990, p. 27:

> "[T]he fortuity of the accident or occurrence is to be assessed from the standpoint of the insured and not the injured party.... The unintended deleterious effects of pollution will be covered even though the result of intended conduct unless it can be shown that the effects were either expected or intended.... It would be a rare case ... where a court would find that an insured intended the harm or expected it."

The policy language defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." The trial court, and the Court of Appeals, have misinterpreted the phrase "neither expected nor intended from the standpoint of the insured." From its inception, the 1966 "revised standard comprehensive general liability insurance policy was meant to cover injuries and damage alleged against a policyholder unless the policyholder intended the damage that in fact happened." *See* Anderson & Matthews, *Winning the 'Expected or Intended' Shell Game*, Risk Management, Dec. 1988, and authorities quoted therein. Thus, for insurance indemnity purposes the insured's act may be intentional but it is not excluded as "intended or expected" unless the insurer proves that the purpose or result of the act, as contrasted with the act itself, is intended or expected. As stated long ago by Justice Benjamin Cardozo in *Messersmith v. American Fidelity Co.*, 232 N.Y. 161, 165, 133 N.E. 432 (1921):

> "Injuries are accidental or the opposite for the purpose of indemnity according to the quality of the results rather than the quality of the causes."

CERCLA contemplates imposing clean-up and response costs upon environmental polluters without regard to whether the subsequent environmental pollution was even foreseeable, much less specifically in-

tended. It makes no sense to place environmental pollution outside the scope of a covered "occurrence." Therefore, I agree that unresolved factual issues relating to the insured's subjective intent and expectation precluded summary judgment on this point in the case.

Further, I agree that the standard CGL policy covers all hazards of liability loss (other than automobile) without regard to whether the hazard was of a kind recognized as a basis for liability during the policy period. Therefore, the standard CGL policy covers a new liability created by legislation enacted after the policy period, as is the case here with the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, *if* the new liability otherwise qualifies as within the coverage. I think this is a big "if" so far as CERCLA is concerned for reasons I will enumerate.

A decision that environmental pollution may be an "occurrence" within the meaning of the policies in question is only a beginning to the present controversy; it does not dispose of it. An equally important consideration, one never considered by the trial court because it never got past the definition of "occurrence," is whether a CERCLA clean-up order, issued or threatened, qualifies under an acceptable definition of what will constitute "property damage" under a CGL policy.

A footnote in the Court of Appeals' Opinion explains the present state of this case as follows:

"Appellee insurers actually defended against this action on four grounds. They alleged not only (1) that the pollution damage was expected or intended from the appellant's standpoint and hence, that it was not a covered 'occurrence,' but also (2) that the CERCLA claims did not involve sums which appellant was legally obligated to pay as 'damages' as required by the policy, (3) that by a separate 'Pollution Exclusion Clause' the policies excluded coverage for a gradual pollution such as this and finally, (4) that appellant failed to give them due and timely notice of its claims

as required by the policies. As the trial court determined there was no covered 'occurrence,' it did not address the validity of appellees' remaining defenses. Consequently, this opinion will only deal with the propriety of the trial court's limited decision as to the 'occurrence' issue, and not with the validity of appellees' remaining defenses."

The Court of Appeals affirmed the trial court on the *one* issue underlying its summary judgment, which we have reversed. Therefore, it must be pointed out, and it should be understood, that the three remaining issues are *revived* in the present posture of this case, and, accordingly, the trial court must deal with these issues upon remand.

In an article by Stephen G. Jeffery, *Indemnification of Super Fund Response Costs,* Journal of Missouri Bar (March 1989), p. 110, the author states:

"In an insurance context, the term 'damages' refers to legal damages and does not include equitable monetary relief.... 'Damages,' as distinguished from claims for injunctive or restitutionary relief, includes only payments to third persons where those persons have a legal claim for damages...."

The Jeffery article then points out that "in resolving the question whether cleanup costs are considered damages under state law, the cases are divided." It cites *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir.1986), holding Hazardous Substance Superfund ("Superfund") response costs represent only an economic loss to the environmental polluter as opposed to damages for injury or destruction of tangible property covered by CGL insurance; *Maryland Casualty Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987), holding that under Maryland law the reimbursement of response costs amounts to equitable relief, a form of relief not damages in the legal sense; and *Continental Ins. Co. v. Northeastern Pharmaceutical & Chemical Co., Inc. (NEPACCO),* 842 F.2d 977 (8th Cir. 1988), *cert. denied sub nom. Missouri v. Continental Insurance Companies, et al.,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43

(1988), also denying coverage on grounds that federal and state government claims for Superfund clean-up costs are not "damages" and the insurers were not liable under their CGL policies. On the other hand, Jeffery also cites three cases deciding that "damages" includes clean-up costs: *New Castle County v. Hartford Accident & Indemnity*, 673 F.Supp. 1359 (D.Del.1987), *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394 (D.N.J.1987), and *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 662 F.Supp. 71 (E.D.Mich.1987). These courts reasoned that damage to the environment resulted in property damage, that the government has a property interest in the environment on behalf of its citizens, and that CGL insurance coverage therefore applies in this situation.

The point is that this "damages" question remains an important, unresolved issue in this case. Is the Superfund order no more than a government mandate to the insured to clean-up its own property (and/or neighboring property) because otherwise the government will do it for the insured and then require restitution or reimbursement of costs, or does the type of relief sought here amount to "damages" within the policies' coverage?

CERCLA provides for recovery from the owner and operator of a facility, or from the previous owner and operator at the time of disposal of any hazardous substance, for three principal types of response costs (42 U.S.C. § 9607(a)):

1) Costs of removal or remedial action incurred by the government, state or federal;

2) Necessary costs of response incurred by any other person; and

3) Damages for injury to, destruction of, or loss of natural resources.

As I understand the facts of this case: (1) EPA action has not yet reached beyond a clean-up order as to the Live Oak, Florida site, leaving the Brown Foundation with the option to "clean-up" there at its own costs rather than to pay response costs, and (2) there are letters from federal and state authorities regarding the Louisville, Kentucky and Brownville, Alabama sites

warning of the imminence of similar clean-up orders for these two sites. If this is a fair characterization of the state of the record, whether the response costs which will follow qualify as "damages" within the meaning of a CGL policy coverage is indeed a serious and complex question which must be further developed and addressed at the trial court level before our Court could begin to consider it.

Next, I believe the Majority Opinion has misinterpreted and misapplied *Cincinnati Ins. Co. v. Vance*, Ky., 730 S.W.2d 521 (1987), in this case, and I dissent from so much of our holding as directs the trial court on remand to "require the insurers to pay for defense and indemnity unless they can prove that the insured subjectively expected or intended the property damage." The insurers should be required "to pay for defense and indemnity" only if the final judgment in this declaratory judgment action establishes all of the elements necessary for policy coverage in favor of the insured.

Certainly I agree with the Majority Opinion that the insurance contract imposes on the insurer not only a duty to indemnify, but also a separate and equally important duty to defend. However, *neither* duty arises unless the claim against the insured falls within the policy coverage. This is the message of *Cincinnati Ins. Co. v. Vance, supra*, and, indeed, it seems so obvious that it should require no citation of authority. Of course I agree that an insurer must defend a claim allegedly within the policy coverage, and must do so even though the particular claim is false or fraudulent. Of course I agree that an insurer who undertakes the defense of the insured must proceed in good faith and cannot withdraw in circumstances where to do so would unfairly prejudice the insured. But *none* of these principles deny the insurer the right to make an independent judgment that there is no coverage and to refuse to provide a defense regardless of the allegations against the insured where the insurer can prove the policy does not

apply.[1]

But all of these propositions put together miss the point. The Majority Opinion mischaracterizes the *Vance* case as having only "decided the separate question of whether an insurer's breach of duty to defend estops it from later litigating its obligation to indemnify." There is *nothing* in *Vance* to suggest there is a duty to defend where there is no policy coverage. Both obligations, the duty to defend and the duty to indemnify, exist only where there is coverage. *Vance* states:

> "However, we disagree with the proposition that the allegations of a complaint against a putative insured compel a defense even where no coverage exists, or that an insurance company that *rightfully* elects to deny coverage and provides no defense is thereafter estopped from litigating the coverage issue." [Emphasis original.] 730 S.W.2d at 523.
>
> . . . .
>
> "The essence of our holding is that the coverage question will turn on the true facts as judicially determined and not on the claims of either party, or the allegations of the complaint against the putative insured. The insurance company may change this result by so acting as to create an estoppel, but its decision to deny coverage and the duty to defend, and to take no action, promptly communicated so that the putative insured will suffer no prejudice in making his own defense if he wishes to do so, does not cause an estoppel." *Id*. at 524.

In the present case we are told that one of the insurers should be liable at the least, regardless of coverage, to the extent that this insurer defended under a so-called "reservation of rights." But we are also told that this reservation of rights expressly provides that the insurer would bear no costs of defense if there is in fact no policy coverage. The agreement to provide a defense under a reservation of rights is an agreement separate and apart from the insurance contract. It is not a decision

made unilaterally by the insurer. Neither party is obliged to enter into this arrangement, and the obligations under a reservation of rights are those expressed and limited by its terms.

In my view of this case, the insurers owe both a duty to defend and a duty to indemnify, coextensively, unless the insurers can prove there is no coverage or unless, because of some reason related to bad faith and estoppel, the duty to defend should be imposed even though no coverage exists.

Thus, the threshold question here is whether there is coverage under the CGL policies at issue, a declaratory judgment question yet to be resolved. If upon remand it is determined that there is no coverage, there should be no liability for defense costs unless it is for some reason which has yet to be identified.

REYNOLDS, J., joins this opinion concurring in part/dissenting in part.

---

1. If an insurer exercises such a right and there is a subsequent determination that there is indeed coverage, the insurer will be required to pay the insured for all of the consequences of its failure to defend.