RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RHONDA OLENIK, Administrator of the estate of Donna
Vanek (22-6080); EDWARD R. VANEK and JODIE R.
HODGES, individually and co-administrators of the
estate of John Brody Edward Vanek (23-5353),
*Plaintiffs-Appellants*,

> Nos. 22-6080/23-5353

*v.*

OHIO CASUALTY INSURANCE COMPANY,
*Defendant-Appellee*.

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
Nos. 5:21-cv-00180; 5:21-cv-00183—Karen K. Caldwell, District Judge.

Argued:  July 23, 2024

Decided and Filed:  August 22, 2024

Before:  MOORE, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Lance W. Turner, CARROLL & TURNER, P.S.C., Monticello, Kentucky, for
Appellant Rhonda Olenik.  Jerome P. Prather, GARMER & PRATHER, PLLC, Lexington,
Kentucky, for Appellants Edward Vanek and Jodie Hodges.  J. Kendrick Wells IV, FROST
BROWN TODD LLP, Louisville, Kentucky, for Appellee.  **ON BRIEF:**  Lance W. Turner,
CARROLL & TURNER, P.S.C., Monticello, Kentucky, for Appellant Rhonda Olenik.  Jerome
P. Prather, J. Conner Niceley, GARMER & PRATHER, PLLC, Lexington, Kentucky, Rhonda
Hatfield-Jeffers, THE LAW OFFICE OF RHONDA HATFIED-JEFFERS, PLLC, Somerset,
Kentucky, for Appellants Edward Vanek and Jodie Hodges.  J. Kendrick Wells IV, Douglas W.
Langdon, Samuel W. Wardle, FROST BROWN TODD LLP, Louisville, Kentucky, for
Appellee.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.    Automobile insurance policies commonly insure both a covered vehicle and a "temporary substitute" if the covered vehicle is in the shop for repairs. *See* 8A Jordan R. Plitt et al., *Couch on Insurance* § 117:61 (3d ed.), Westlaw (database updated June 2024).  This case requires us to interpret the phrase "temporary substitute" in an insurance policy governed by Kentucky law.  Donna Vanek worked for a construction company that had insured two trucks, including a Ford F-250, through Ohio Casualty Insurance Company.  Vanek would occasionally drive the F-250, but she typically used her own Kia Optima for much of this work. She was driving her Kia with her young nephew to pick up paint for a job when a semitruck recklessly struck her car and killed both occupants.  At the time of this tragic accident, the company's Ford F-250 was in a repair shop.  The estates of Vanek and her nephew thus sued Ohio Casualty, claiming that the Kia qualified as a covered "temporary substitute" for the F-250.

The district court rejected this reading and granted summary judgment to Ohio Casualty. Yet a reasonable jury could find for the estates under the policy's plain language.  The jury could conclude that the Kia qualified as a "substitute" (that is, a replacement) because several witnesses testified that Vanek would have driven the F-250 to the paint store if it had been available.  And the jury could view the Kia as a "temporary" substitute (that is, one for a limited time) because the company got the F-250 back a short time later.  To reach the contrary conclusion, the district court accepted Ohio Casualty's claim that a noncovered car cannot qualify as a "temporary substitute" unless *all* covered vehicles are in the shop.  But Ohio Casualty did not base this interpretation on the policy's text.  It instead based the interpretation on a misreading of a state appellate court decision.  So we reverse and remand for proceedings consistent with this opinion.

I

Shawn Perkins founded a business—Beyond the Surface, LLC—that performed "[c]oncrete and asphalt" work for its customers.  Perkins Dep., R.37, PageID 316.  The company

would repave parking lots and sidewalks on commercial and residential properties.  It also would perform any necessary repainting—such as repainting the stripes that mark off individual parking spaces—as part of these projects.  By 2020, Perkins had transitioned from Beyond the Surface's owner to its project manager.  The company had also hired six or seven workers to perform the manual labor.

Perkins's fiancée, Donna Vanek, helped run the business.  Among other duties, she "worked in the office," "organized the crews," took the crews to job sites, picked up "materials" for projects, and ran other company errands.  *Id.*, PageID 318, 327–28, 332–34, 344.  Vanek often drove her Kia Optima when performing these tasks.  Yet Beyond the Surface also owned a Ford F-250 and an International TerraStar.  Vanek would sometimes drive one of these trucks to pick up supplies.  She probably drove a truck "once or twice" per week or every other week.  *Id.*, PageID 334, 348.

In June 2020, Beyond the Surface began a repaving project at a strip mall in Frankfort, Kentucky.  On June 29, the company ran low on paint for this project.  Perkins thus asked Vanek to pick up some "commercial latex traffic paint" at a Sherwin-Williams store in Lexington.  *Id.*, PageID 326, 362.  Vanek planned to buy two five-gallon buckets of yellow paint, two five-gallon buckets of white paint, brushes, and rollers.  Vanek's eleven-year-old nephew Brody—who liked to spend time with Vanek and Perkins in the summer—had also accompanied her to the work site that day.  Brody opted to go with Vanek on her supply run to the Sherwin-Williams store.

Vanek chose to drive there in her Kia.  The company's F-250 "was in the shop" that day. *Id.*, PageID 328–29.  And other workers were using the TerraStar at the "job site."  *Id.*, PageID 330.  They had connected a "trailer" to this truck and put the paint "striping machine" in this trailer to complete the painting.  *Id.*, PageID 331.

Before Vanek and Brody got to the store, however, tragedy struck.  A truck driver slammed into the back of the Kia while on the freeway connecting Frankfort and Lexington. Vanek and Brody both died from their injuries.

The estates of Vanek and Brody (collectively, the "Estates") recovered substantial sums from the negligent truck driver's employer and this employer's insurer.  But the Estates argued

that this recovery did not fully compensate them for the immense harm that the truck driver had caused.

This claim implicated the insurance policy that Ohio Casualty Insurance Company had issued to Beyond the Surface for the Ford F-250 and TerraStar. The policy's underinsured motorists coverage allowed an "insured" to seek payment from Ohio Casualty for injuries caused by another driver who was driving an "underinsured motor vehicle." Policy, R.40-2, PageID 602. It defined "insured" to cover any person "occupying" *either* a "covered 'auto'" *or* a "temporary substitute" for a covered auto that was "out of service" due to, among other things, "repair." *Id.* Ohio Casualty denied coverage under these terms. So the Estates sought payment from it in suits filed in Kentucky state court. They alleged that Vanek's Kia qualified as a "temporary substitute" for the Ford F-250, which Beyond the Surface had taken in for repairs at the time of the accident.

Ohio Casualty removed these state suits to a federal district court based on that court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(1). The federal court consolidated the two cases. Ohio Casualty then sought summary judgment on the ground that the Kia did not qualify as a covered "temporary substitute" for the Ford F-250.

The district court agreed. It granted summary judgment to Ohio Casualty. *See Vanek v. Ohio Cas. Ins.*, 2022 WL 17345488, at *3–5 (E.D. Ky. Nov. 30, 2022). After the court denied the Estates' motions to alter or amend the judgment, *see Vanek v. Ohio Cas. Ins.*, 2023 WL 2947425, at *2 (E.D. Ky. Apr. 14, 2023), they appealed. "We review the district court's decision de novo." *Wesco Ins. v. Roderick Linton Belfance, LLP*, 39 F.4th 326, 331 (6th Cir. 2022).

II

A

A federal court with diversity jurisdiction over a state-law claim must follow the choice-of-law rules of the State in which it sits—here, Kentucky. *See N. Am. Specialty Ins. v. Pucek*, 709 F.3d 1179, 1182 (6th Cir. 2013). The parties agree that a Kentucky court would follow its

own contract law to interpret Ohio Casualty's policy. So we may assume that Kentucky law applies. *See P.I. & I. Motor Express, Inc. v. RLI Ins.*, 40 F.4th 398, 407 (6th Cir. 2022).

To decide this case's contract-interpretation question, then, we must follow the well-established interpretive rules that the Kentucky Supreme Court has set. *See Pennington v. State Farm Mut. Auto. Ins.*, 553 F.3d 447, 450 (6th Cir. 2009). Like most state courts, the Kentucky Supreme Court has long held that courts must generally enforce insurance contracts "as written." *Foreman v. Auto Club Prop.-Cas. Ins.*, 617 S.W.3d 345, 349 (Ky. 2021); *see Nationwide Mut. Ins. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999); *Kemper Nat'l Ins. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 875–76 (Ky. 2002). That is, we must give a contract's words the ordinary meaning that the average insured would understand them to have. *See Foreman*, 617 S.W.3d at 349; *James Graham Brown Found. v. St. Paul Fire & Marine Ins.*, 814 S.W.2d 273, 279 (Ky. 1991). Like most state courts, the Kentucky Supreme Court also resolves ambiguities "in favor of the insured." *Thomas v. State Farm Fire & Cas.*, 626 S.W.3d 504, 506–07 (Ky. 2021); *see St. Paul Fire & Marine Ins. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994). And it will conclude that an ambiguity exists if the relevant words or phrases in the policy are open to "two reasonable interpretations[.]" *Davis v. Progressive Direct Ins.*, 626 S.W.3d 518, 521 (Ky. 2021). In that scenario, the court picks the reading that falls within the "reasonable expectations" of the insured. *See id.* at 521–22; *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003).

Given this framework, we start with the language of Ohio Casualty's insurance policy. The policy's underinsured motorists coverage promises to pay the compensatory damages that an "insured" suffers because of an accident caused by "the owner or driver of an 'underinsured motor vehicle'." Policy, R.40-2, PageID 602. It then lists the parties who qualify as "insureds" in part as the occupants of a "temporary substitute" of an out-of-service "covered 'auto'":

2.  If the insured is a partnership, limited liability company, corporation or any other form of organization, then the following are "insureds" for a covered "auto" described on the policy, a replacement for a covered "auto" described on the policy, or for a newly acquired "auto":

a. Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

*Id.*

The parties agree on several points about how this text applies to this case's facts. They agree that the Ford F-250 and TerraStar each qualified as a "covered 'auto'." *Id.* They agree that Vanek and Brody had been "'occupying'" the Kia at the time of the accident. *Id.* They agree that the F-250 was "out of service" due to "repair[.]" *Id.* And they agree that the TerraStar was not "out of service" but that other employees were using it at the strip-mall project. *Id.*

The parties' dispute thus boils down to a narrow question: Did the Kia qualify as a "temporary substitute" for the out-of-service F-250? These two "common words" have an unambiguous "ordinary meaning" that any "average" person would readily understand. *Nolan*, 10 S.W.3d at 131. The average insured would call a vehicle a "substitute" if it "takes the place of another" vehicle—that is, if it qualifies as a "replacement" for that other vehicle. *The American Heritage Dictionary of the English Language* 1738 (5th ed. 2018). And the average insured would call this substitution "temporary" if it will last "for a limited time" and does not count as a "permanent" switch. *Id.* at 1792; *see also Couch on Insurance*, *supra*, § 117:79. So the average insured would readily conclude that a vehicle qualifies as a "temporary substitute" if the insured used the vehicle to temporarily stand in for a covered auto to complete a task for which the insured would have used that auto. *See James Graham Brown Found.*, 814 S.W.2d at 279.

At least at this summary-judgment stage, the Estates have presented enough evidence from which a reasonable jury could find both elements. For starters, one could reasonably say that the Kia "[took] the place of" the Ford F-250 if Vanek would have driven the truck to the Sherwin-Williams store had it not been in the shop. *American Heritage*, *supra*, at 1738. In other words, the Kia qualifies as a substitute if "the old vehicle" (the Ford F-250) "would have been used for the same purpose for which" Vanek had put the Kia "at the time of the accident." *Couch on Insurance*, *supra*, § 117:89. And a jury could find that Vanek would have used the Ford F-250 if she could have. Among other evidence, Perkins, the project manager and Vanek's

fiancée, testified that she "probably would have" used the truck "because there was a lot of paint she was getting." Perkins Dep., R.37, PageID 370. He added that the paint "fit a lot better" in the F-250 than the Kia and that Vanek typically used the truck to pick up "larger materials[.]" *Id.*, PageID 328, 334. Perkins's aunt (the owner of Beyond the Surface at the time) agreed that Vanek likely would have taken the F-250 to pick up the paint. Cowan Dep., R.39, PageID 440. As an additional reason for this conclusion, she noted that Brody (Vanek's young nephew) enjoyed riding in the truck. *Id.*, PageID 427. A third employee filed a declaration to the same effect. Rivera Decl., R.46-4, PageID 793. And Vanek's brother opined that she would usually use a bigger vehicle to pick up materials "[b]ecause you couldn't fit stuff in a Kia." E. Vanek Dep., R.38, PageID 399.

Next, a reasonable jury could conclude that Vanek made a "limited"—not a "permanent"—switch of the Kia for the F-250 for supply runs like this one. *American Heritage*, *supra*, at 1792. Beyond the Surface got the F-250 back from the shop in a "week" or a "week and a half." Perkins Dep., R.37, PageID 329. The company did not simply get rid of the truck. After the F-250 returned to service, then, Vanek could have continued to use it to pick up "larger materials"—just as she had done before the accident. *Id.*, PageID 334. In short, the Kia qualifies as a "temporary substitute" for the F-250 under the Estates' version of the facts.

B

Ohio Casualty responds with two legal challenges to our reading of the phrase "temporary substitute" and one factual challenge to our reading of the record. Each challenge lacks merit.

*Legal Challenge One*: Ohio Casualty primarily argues that the temporary-substitute clause could apply only if *both* the F-250 *and* the TerraStar were "out of service because of [their] breakdown, repair, servicing, 'loss' or destruction." Policy, R.40-2, PageID 602. Since Beyond the Surface had access to the TerraStar on the day of the accident, this argument goes, Vanek's Kia could not have qualified as a "temporary substitute" for these covered autos.

This interpretation has both textual and precedential problems. Start with the text. Ohio Casualty makes no effort to justify its reading under the insurance policy's language. The policy

covers a "temporary substitute for *a* covered 'auto'" (a singular noun) if that "covered 'auto'" is "out of service because of *its* breakdown, repair, servicing, 'loss' or destruction." *Id.* (emphases added). Ohio Casualty asks us to rewrite this text as if the temporary-substitute clause applied only if *all* covered *autos* were out of service based on the identified grounds. But the Kentucky Supreme Court bars courts from "inserting words" into contracts that are not there. *Kemper*, 82 S.W.3d at 875–76. That approach makes good sense for this insurance policy. A separate policy limit on the amount that Ohio Casualty will pay recognizes that an insured may have "more than one covered 'auto[.]'" Policy, R.40-2, PageID 603. Thus, although the policy contemplates multiple covered cars, Ohio Casualty still used the singular noun ("covered 'auto'") when writing its temporary-substitute clause. We must respect this choice. Under the chosen language, if a party uses a replacement vehicle for a specific out-of-service covered auto, that vehicle can qualify as a "temporary substitute" even if the business has other covered vehicles in service.

Turn to precedent. Ohio Casualty supports its interpretation with a single decision from an intermediate appellate court: *Estate of Turner v. Globe Indemnity Co.*, 223 S.W.3d 840 (Ky. Ct. App. 2007). True, we may treat these appellate decisions as "persuasive" evidence of how a state supreme court would analyze a question. *See, e.g.*, *Pennington*, 553 F.3d at 450 (citation omitted). But Ohio Casualty overreads *Turner* to establish a rule that reaches far beyond its facts.

In that case, the Kentucky court held that Tony Turner, a news anchorman, had not used his personal car as a temporary substitute for his television station's company cars. *Turner*, 223 S.W.3d at 843. Turner lived in Harlan and commuted to his station in nearby Hazard. *Id.* at 841. On a typical Monday, he would drive to the Hazard station to pick up any available "company vehicle" and use this vehicle for the rest of the week. *Id.* On one fateful Monday, however, Turner planned to work from Harlan all day when his station assigned him to cover a story in a county located in the opposite direction of Hazard. *Id.* For convenience reasons, Turner did not want to drive out of his way to pick up a company car in Hazard and did not even inquire into whether the station had any company cars available. *Id.* Rather, he drove his personal car straight to this county. *Id.* He tragically died in an accident on the way back. *Id.* The television

station had an insurance policy for its ten covered autos like the policy at issue here. *Id.* at 842.

Turner's wife suggested that his personal car had been a "temporary substitute" for one of these

cars. *Id.* She supported this reading with the affidavit of a mechanic, who suggested that one of

the cars had been "in need of repair and not in driving condition" on the day of the accident. *Id.*

The Kentucky Court of Appeals disagreed with Ms. Turner. *Id.* at 843. The court

reasoned that Turner had "serviceable fleet vehicles available" for his use "and that he chose to

drive his own vehicle for his own convenience." *Id.* This holding does Ohio Casualty no good.

Under the Estates' version of events (which we must accept at this stage), Vanek did not take her

Kia for mere "convenience." *Id.* She took it because the F-250 was in the shop.

In the process of reaching this conclusion, though, the *Turner* court made an ambiguous

statement about what Turner's wife had to prove to establish that his car qualified as a temporary

substitute. According to the court, she had "to provide some evidence to show: (1) that no

company vehicle was available for her husband because of breakdown, repair, servicing, loss or

destruction, and (2) that Turner was driving his personal vehicle because of this unavailability."

*Id.* at 842–43. One could read the first element in different ways. On the one hand, Ohio

Casualty reads this element (in particular, its "*no* company vehicle" language) to adopt a

categorical rule that *all* covered vehicles must be unavailable for one of the listed reasons to

trigger the temporary-substitute clause. *Id.* at 842 (emphasis added). And since the TerraStar

was unavailable for a different reason (its use by other employees), Ohio Casualty suggests that

the Estates have not met this test.

On the other hand, one could read the first element (in particular, its "because of"

language) as requiring only an adequate connection between a "breakdown, repair, servicing,

loss or destruction" and a lack of any available car. *Id.* at 842–43. This view would *not* require

all ten company cars to be out of service because of a "breakdown, repair, servicing, loss or

destruction." *Id.* at 842. If, for example, nine cars were unavailable because other employees

were using them and one was unavailable because of its breakdown, one might still say that "no

company vehicle was available for [Ms. Turner's] husband because of breakdown" (among other

reasons). *Id.* at 842–43. Indeed, *Turner* itself later suggested this reading. When rejecting

Ms. Turner's reliance on the fact that one of the ten cars was out of service, the court did not respond that the other nine cars were in service (all it would have needed to say under Ohio Casualty's interpretation). *Id.* at 843. The court instead relied on a lack of evidence that the other nine "company vehicles were unavailable for Turner's use" for *any* reason. *Id.* Here, by contrast, the Estates have presented "evidence" that the TerraStar was unavailable to Vanek because other employees were using it at the job site. *Id.*

In the end, the Kentucky Supreme Court's interpretive rules tell us to adopt the reading of *Turner* that best fits the insurance policy's text. *See Foreman*, 617 S.W.3d at 349. So we reiterate that Ohio Casualty has not tried to mesh its reading of *Turner* with its policy's use of a singular noun ("covered 'auto'") in the temporary-substitute clause. Policy, R.40-2, PageID 602. We thus opt for the narrower reading of *Turner*. If the Estates convince a jury that Vanek drove the Kia because the F-250 was in the shop and others were using the TerraStar, they will meet *Turner*'s test.

*Legal Challenge Two*: Ohio Casualty alternatively argues that the Kia could not qualify as a temporary substitute because Vanek regularly used it for the business. This second argument at least relies on the policy's language: The policy required the Kia not just to be a "substitute" but also a "temporary" one. *Id.* Ohio Casualty claims that an insured cannot satisfy this temporal element if "the use of [the substitute] automobile is not . . . temporary, but regular and permanent[.]" *Couch on Insurance*, *supra*, § 117:79. And here, the evidence leaves no doubt that Vanek regularly used her Kia for many work purposes and would have continued to do so after regaining access to the F-250.

Ohio Casualty's reading lacks merit for a grammar reason: Its reading changes the noun that the adjective "temporary" modifies. The policy does not require the insured to *use* the replacement vehicle temporarily; it requires the replacement vehicle to be a temporary *substitute*. The two mean different things. If an insured loses access to a covered auto because of its complete "destruction," the adjective "temporary" shows that the policy will not cover a permanent replacement for this totaled car. Policy, R.40-2, PageID 602. At the same time, a car can qualify as a "temporary substitute" for a covered auto even if the insured regularly uses that

replacement car for other purposes. *Id.*; *cf. Stonehocker v. Gulf Ins.*, 368 P.3d 1187, 1193–94 (Mont. 2016); *Lewis v. Bradley*, 97 N.W.2d 408, 411–13 (Wis. 1959). In short, it does not matter that Vanek *regularly used* the Kia. It matters that she *temporarily substituted* the Kia for the F-250 on the fatal trip and that she would have continued to use the F-250 after the company got it back.

*Factual Challenge*: Out of legal challenges, Ohio Casualty turns to the facts. Even accepting our reading of "temporary substitute," the insurer argues, the evidence would not allow a reasonable jury to conclude that Vanek would have driven the F-250 if it had been available to her. Among other reasons, Ohio Casualty points out that Vanek's brother lacked "personal knowledge" of which car she would have used because he knew little about the business and lived hours away. Appellee's Br. 28 n.59 (emphasis omitted). It adds that Perkins and another employee engaged in "pure speculation" by opining that Vanek likely would have taken the F-250 on the fatal trip. *Id.* at 31. And when Ohio Casualty initially interviewed Perkins, he "did not mention" anything about the F-250. *Id.* at 5.

Even setting aside the testimony of Vanek's brother, however, the Estates have created a genuine issue of material fact on this issue. As we have noted, Perkins testified that Vanek regularly (if sparingly) used the F-250 and that she probably would have done so on this occasion. And while Ohio Casualty suggests that Perkins has questionable credibility because he failed to mention this fact in his initial interview, we do not judge the credibility of witnesses at this stage of the case. *See Gambrel v. Knox County*, 25 F.4th 391, 404 (6th Cir. 2022). Rather, we must resolve all evidentiary and credibility disputes in the Estates' favor. *See id.*

We reverse and remand for proceedings consistent with this opinion.