RENDERED: DECEMBER 1, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0347-MR

KKR & CO. INC.                                                                APPELLANT

v.         APPEAL FROM FRANKLIN CIRCUIT COURT
           HONORABLE PHILLIP J. SHEPHERD, JUDGE
           ACTION NO. 21-CI-00348

COMMONWEALTH OF KENTUCKY                                APPELLEE

AND

NO. 2022-CA-0350-MR

PAAMCO PRISMA, LLC;
PAAMCO/PRISMA HOLDINGS, LLC;
AND PRISMA CAPITAL PARTNERS
LP                                                                          APPELLANTS

v.         APPEAL FROM FRANKLIN CIRCUIT COURT
           HONORABLE PHILLIP J. SHEPHERD, JUDGE
           ACTION NO. 21-CI-00348

COMMONWEALTH OF KENTUCKY                                APPELLEE

AND

NO. 2022-CA-0352-MR


DANIEL BOONE FUND, LLC                                              APPELLANT


                          APPEAL FROM FRANKLIN CIRCUIT COURT
v.                        HONORABLE PHILLIP J. SHEPHERD, JUDGE
                          ACTION NO. 21-CI-00348


COMMONWEALTH OF KENTUCKY                                            APPELLEE

AND


                          NO. 2022-CA-0353-MR


BLACKSTONE ALTERNATIVE
ASSET MANAGEMENT
ASSOCIATES LLC; BLACKSTONE
ALTERNATIVE ASSET
MANAGEMENT L.P.; AND
BLACKSTONE HENRY CLAY FUND,
LLC                                                                APPELLANTS


                          APPEAL FROM FRANKLIN CIRCUIT COURT
v.                        HONORABLE PHILLIP J. SHEPHERD, JUDGE
                          ACTION NO. 21-CI-00348


COMMONWEALTH OF KENTUCKY                                            APPELLEES

<u>OPINION</u>
<u>AFFIRMING IN PART,</u>
<u>REVERSING IN PART,</u>
<u>AND REMANDING</u>

\*\* \*\* \*\* \*\* \*\*

BEFORE: CALDWELL, DIXON,[1] AND ECKERLE, JUDGES.

CALDWELL, JUDGE: The main question presented in these appeals is whether indemnity clauses in several investment-related contracts involving the Kentucky Retirement Systems, now called the Kentucky Public Pensions Authority ("Retirement") are unconstitutional. The Kentucky Attorney General ("OAG") challenged the constitutionality of those indemnity clauses by filing a declaratory judgment action in the Franklin Circuit Court. The trial court found the indemnity clauses to be unconstitutional in a seventy-six-page order.[2] We agree. However, we must reverse and remand for an evidentiary hearing the trial court's grant of

---

[1] Judge Donna Dixon concurred in the Opinion prior to her retirement effective November 20, 2023. Release of this Opinion was delayed by administrative handling.

[2] Among those named by the OAG as defendants were KKR & Co., Inc. (f/k/a KKR & Co., L.P.), Prisma Capital Partners LP, Prisma Capital Partners LLC, Blackstone Alternative Asset Management L.P., Blackstone Alternative Asset Management Associates LLC, PAAMCO Prisma, LLC (f/k/a Pacific Alternate Asset Management Company, LLC), PAAMCO Bluegrass, Inc., Daniel Boone Fund, and Henry Clay Fund. Those defendants have a tangled history, including name changes and some defendants being owned by others in whole or in part at various points. To try to simplify matters, we shall simply refer to the Appellants as KKR, Prisma, BAAM, PAAMCO, the Boone Fund, and the Clay Fund or, collectively, Appellants. Because it is not necessary to do so in order to resolve the issues before us, we refrain from relating in detail the Appellants' corporate histories or the ownership interests thereof.

summary judgment to the OAG stemming from a motion to dismiss for lack of personal jurisdiction filed by KKR.

## I. RELEVANT FACTUAL AND PROCEDURAL HISTORY

The facts underlying these appeals are complex and the circuit court record is over 5,000 pages long, so we shall attempt to simplify, streamline, and summarize to the maximum extent possible. Moreover, we have considered the entirety of the parties' voluminous briefs but will only discuss the arguments and factual recitations therein which we deem crucial to resolve properly these appeals. All issues raised by the parties which are not discussed herein lack merit, are redundant or are otherwise unnecessary for us to address.

To understand why the OAG filed the underlying declaratory judgment action we must discuss what is commonly referred to as the *Mayberry* action, which was filed in 2017 by eight individual members of Retirement. As we explained in an unpublished opinion resolving a case related to *Mayberry*:

> The *Mayberry* Plaintiffs originally sued current and former trustees and officers of [Retirement], as well as certain outside advisors and investment managers, including Appellants PAAMCO and Prisma, for leading [Retirement] to enter into three "fund-of funds" hedge-fund investments. The Plaintiffs alleged that these investments were unsuitable, underperformed relative to the stock market, and increased [Retirement's] unfunded pension liabilities. The Plaintiffs did not provide [Retirement] with advance notice that they were filing suit, nor did they obtain legal authorization to bring claims on behalf of [Retirement]. Rather, they opted to

> sue [Retirement] as a nominal defendant, contending that [Retirement's] Board of Trustees was conflicted and incapable of evaluating whether [Retirement] should assert the claim independently.
>
> . . .
>
> [Eventually], the *Mayberry* Plaintiffs and "Nominal Defendant" [Retirement] filed a Joint Notice with the circuit court indicating that . . . [Retirement] "will not pursue the claims asserted by [the *Mayberry*] Plaintiffs" but the claims "appear to have merit," and [Retirement] "believes that it is in the best interests of [Retirement] for [the *Mayberry*] Plaintiffs to continue their pursuit of these claims on a derivative basis on [Retirement]'s behalf."

*Prisma Capital Partners, LP v. Kentucky Retirement Systems*, No. 2019-CA-000700-MR, 2020 WL 5083454, at *2 (Ky. App. Aug. 28, 2020).  In another related opinion, our Supreme Court described the *Mayberry* plaintiffs as having alleged  the "fund-of-fund" investments had "lost over $100 million by 2018 and further accumulated fees expected to measure in the hundreds of millions of dollars.  These losses, according to [the *Mayberry*] Plaintiffs, contributed to what is now a $25 billion funding shortfall in [Retirement's] general pool of assets." *Overstreet v. Mayberry*, 603 S.W.3d 244, 250 (Ky. 2020) (internal quotation marks omitted).

The merits of *Mayberry* were never fully resolved because our Supreme Court unanimously held the *Mayberry* plaintiffs lacked standing and remanded the matter to the Franklin Circuit Court "with direction to dismiss the

complaint." *Id.* at 266. However, in the gap between the issuance of that opinion and it becoming final, the OAG asked the trial court to intervene as a plaintiff in *Mayberry*. *See KKR & Co., Inc. v. Mayberry*, ___ S.W.3d ___, 2023 WL 2939473, at *2 (Ky. App. Apr. 14, 2023) (not yet final). The OAG also filed a similar separate action, *id.*, which – as of the writing of this Opinion – remains pending. Franklin Circuit Court Action No. 20-CI-00590. Despite our Supreme Court's directive to "dismiss the complaint[,]" the Franklin Circuit Court granted the OAG's motion to intervene as a plaintiff in *Mayberry*. *Id.* But we recently held the trial court erred by permitting that intervention since our Supreme Court had specifically ordered the case to be dismissed. *Id.* at *3-4.

Meanwhile, having incurred substantial defense costs in *Mayberry*, some Appellants sought indemnity from Retirement.[3] Specifically, Prisma sued

---

[3] Though the parties vigorously dispute whether the clauses at issue are true indemnification provisions, there appears to be little practical difference between an indemnity clause and a reimbursement or hold harmless clause. We have held that "[a] contract of indemnity is an obligation or duty requiring a promisor . . . to make good any loss or damage which another has incurred while acting at the request or for the benefit of the promisor." *Intercargo Ins. Co. v. B.W. Farrell, Inc.*, 89 S.W.3d 422, 426 (Ky. App. 2002). *Indemnify* is defined in relevant part as "[t]o reimburse (another) for a loss suffered because of a third party's or one's own act or default; HOLD HARMLESS." *Indemnify*, BLACK'S LAW DICTIONARY (11th ed. 2019). An *indemnity clause* is similarly defined as "[a] contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur. – Also termed *hold-harmless clause*; *save-harmless clause*." *Indemnity clause*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Given those definitions, we reject Appellants' argument that indemnity only involves an obligation to repay another for costs incurred due to the conduct of a third party. Indemnity may involve reimbursement for costs incurred due to the obligor's own conduct under the plain language of the definition of *indemnity* and *indemnity clause*. Thus, we agree with the OAG that the contracts at issue contain indemnity clauses, and we shall refer to them as such.

Retirement in a Delaware state court, BAAM sued Retirement in a Delaware state court, and PAAMCO sued Retirement in a California state court. BAAM later dismissed its Delaware action and sued Retirement in the Franklin Circuit Court. The circuit court dismissed BAAM's action on ripeness grounds, a decision we recently affirmed. *Blackstone Alternative Asset Management L.P. v. Kentucky Public Pensions Authority*, No. 2022-CA-0494-MR, 2023 WL 3556612, at *1 (Ky. App. May 19, 2023) (unpublished).

Although each contract has its own specific language, the essential gist of each indemnity clause is the same (except for, as we shall later discuss, the Boone Fund's agreement which requires the indemnity to be paid from the Boone Fund's assets, not Retirement's): Retirement agreed to reimburse Appellants for costs they incurred due to a breach by Retirement. Appellants assert Retirement committed an actionable breach when it agreed with the *Mayberry* plaintiffs' allegations of wrongdoing regarding the hedge fund investments after having asserted in the investment agreements challenged in *Mayberry* that it (Retirement) was an informed, sophisticated, experienced investor.

Against that jumbled backdrop, the OAG filed this declaratory judgment action in April 2021. Though lengthy, the complaint sought limited relief: first, a declaration that the indemnity clauses were unenforceable and, second, a declaration that the Commonwealth of Kentucky – in the form of

Retirement – is immune from the Delaware and California breach of contract suits. KKR filed a motion to dismiss based upon a lack of personal jurisdiction. Ultimately, the trial court issued a ruling wholly favorable to the OAG. Appellants then filed the four appeals at issue, all of which we shall resolve in this Opinion.[4]

## II. ANALYSIS

### A. *Amici Curiae* Motion

Before we address the issues, we first resolve a motion to file a brief as *amici curiae* submitted by three law professors. Though we ultimately do not adopt their positions, we appreciate their scholarly input and have granted the *amici*'s motion by separate order.

### B. Standards of Review

But before we attempt to untangle that Gordian procedural knot inherent in the trial court granting summary judgment to the OAG on a motion to dismiss filed by KKR, we first briefly list the applicable standards of review.

Motions to dismiss are governed by CR[5] 12.02, which provides:

> Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by

---

[4] *KKR & Co., Inc. v. Commonwealth of Kentucky*, No. 2022-CA-0347-MR; *PAAMCO Prisma, LLC, et al. v. Commonwealth of Kentucky*, No. 2022-CA-0350-MR; *Daniel Boone Fund, LLC v. Commonwealth of Kentucky*, No. 2022-CA-0352-MR; and *Blackstone Alternative Asset Management L.P., et al. v. Commonwealth of Kentucky*, No. 2022-CA-0353-MR.

[5] Kentucky Rules of Civil Procedure.

motion: . . . (b) lack of jurisdiction over the person . . . . If, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . .

When deciding a motion to dismiss "the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true. Because the issue of personal jurisdiction is a legal question to be answered in light of those allegations" our review is *de novo*. *Bondurant v. St. Thomas Hosp.*, 366 S.W.3d 481, 483 (Ky. App. 2011) (citations omitted).

The standards governing summary judgment and motions under CR 12.02 are similar but "not interchangeable . . . ." *Schell v. Young*, 640 S.W.3d 24, 33 (Ky. App. 2021). A court may properly grant summary judgment only if:

as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant. Summary judgment is not intended as a substitute for trial and should be cautiously applied. Instead of deciding an issue of fact, the trial court *reviews* the evidence to determine whether a real issue of fact exists. And in performing this review, the trial court must view the evidence through a lens colored in favor of the party opposing summary judgment.

*Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 604 (Ky. 2014) (internal quotation marks, footnotes, and citations omitted).

In sum, a court may not grant summary judgment "if there exists a material fact which requires a trial." *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 276 (Ky. 1991). Inherent in that summary judgment standard is an inflexible rule: a court may only "determine" the presence of "genuine issues to be tried[;]" the court may not "resolve" any genuine issues because all "[q]uestions relating to the credibility of witnesses and the weight of the evidence must await trial." *Id.* We review a decision to grant summary judgment *de novo*. *Schmidt v. Leppert*, 214 S.W.3d 309, 311 (Ky. 2007).

### C. KKR's Motion to Dismiss

The first major issue we must confront is the propriety of the trial court granting summary judgment to the OAG on a motion to dismiss for lack of personal jurisdiction filed by KKR. Precedent requires a court to conduct an evidentiary hearing when there are conflicting facts materially impacting a motion to dismiss based on lack of personal jurisdiction. Because the trial court did not follow that procedure, we reverse the summary judgment and remand for an evidentiary hearing, followed by issuance of a new decision.

"A court must have personal jurisdiction to hear a matter affecting a specific person." *Soileau v. Bowman*, 382 S.W.3d 888, 890 (Ky. App. 2012). Thus, the trial court had to first ensure that it had personal jurisdiction over KKR to address the merits of the OAG's KKR-related claims. KKR asserts it is not

-10-

subject to the trial court's jurisdiction because, *inter alia*, Kentucky is neither its

state of incorporation nor the location of its principal place of business. Of course,

being a nonresident does not automatically exempt a person or corporate entity

from the jurisdiction of Kentucky courts. As our Supreme Court explained:

> the proper analysis of long-arm jurisdiction over a
> nonresident defendant consists of a two-step process.
> First, review must proceed under KRS[6] 454.210 to
> determine if the cause of action arises from conduct or
> activity of the defendant that fits into one of the statute's
> enumerated categories. If not, then *in personam*
> jurisdiction may not be exercised. When that initial step
> results in a determination that the statute is applicable, a
> second step of analysis must be taken to determine if
> exercising personal jurisdiction over the non-resident
> defendant offends his federal due process rights.

*Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011).

In its motion to dismiss, KKR broadly asserted it "lacks any business

connections of its own with the Commonwealth of Kentucky . . . ." KKR

buttressed that assertion with an affidavit from one of its officials, Christopher Lee,

averring in relevant part:

> Since KKR's formation in 2007, KKR has never: (i)
> leased or owned any real property in Kentucky; (ii)
> maintained any office in Kentucky; (iii) had any
> employees who resided or regularly worked in Kentucky;
> (iv) registered to conduct business in Kentucky; (v)
> maintained any bank account in Kentucky; or (vi)

---

[6] Kentucky Revised Statutes.

-11-

conducted any business in Kentucky relating to [Retirement] or [Prisma] . . . .

In its response, the OAG did not directly attack the contents of Lee's affidavit. Instead, the OAG asserted "the claims in this action arose from the Defendants having transacted business and contracted to supply services in this Commonwealth . . . ." The OAG emphasized that KKR had retained Kentucky counsel to defend it in the *Mayberry* action. Finally, the OAG asserted KKR had engaged in tortious conduct in Kentucky by making misrepresentations about the funds invested by Retirement.

The trial court, obviously unsatisfied with the information provided by the parties, based its decision in large part on its own copious independent research. For example, the court cited numerous snippets from KKR's website and various filings KKR had submitted to the SEC. The court even cited to the minutes of a meeting of the Alaska Retirement Management Board of Trustees. All told, the court devoted roughly thirty pages of its summary judgment order to relating its independent research. The trial court then noted a disparity between the results of its independent research and Lee's affidavit, noting that "Mr. Lee's Affidavit simply cannot be reconciled with other publicly-available facts." Then the court found the information it had independently ascertained was "more inherently reliable" than Lee's "troubling" affidavit.

-12-

KKR contends the trial court erred by conducting its own research and by granting summary judgment on disputed facts. We disagree about the independent research but agree about the grant of summary judgment.

As to the trial court's research, Kentucky precedent does not constrict courts to only considering information provided by the parties. Instead, our Supreme Court has held that courts may "properly sua sponte consider documents available to the general public." *Fox v. Grayson*, 317 S.W.3d 1, 18 n.82 (Ky. 2010). Of course, a court must be careful to remain a neutral decisionmaker and not become an advocate, and a party risks receiving an adverse ruling if it presents insufficient information to a court since a court is not required to conduct its own research. In short, a party should present sufficient information to a court to support its position; however, a court has the discretion to conduct independent research, so long as that research is limited to information available to the public.

Here, though unusually extensive, the trial court's independent research contained information available to the public. Consequently, we reject KKR's argument that the court committed reversible error simply by conducting its own research.

The summary judgment itself is a different story. The trial court casually stated that it did not really matter whether KKR's motion was analyzed as

a motion to dismiss or a motion for summary judgment. Indeed, sometimes that does not matter. *Fox*, 317 S.W.3d at 7 n.21. But here, it did.

The overarching principle of summary judgment is that it is proper *only* if there is not a "genuine issue as to any material fact . . . ." CR 56.03. The judgment here states, correctly, that there is a factual gulf between the information the court's own research yielded and Lee's affidavit. The presence of such a dispute forecloses summary judgment. *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016) ("The trial court's primary directive in this context is to determine whether a genuine issue of material fact exists; if so, summary judgment is improper[.]"). Nonetheless, the court resolved the dispute by crediting its own research and discounting Lee's affidavit. Kentucky precedent has long forbidden granting summary judgment based on such credibility assessments or weighing of conflicting evidence. *James Graham Brown Foundation, Inc.*, 814 S.W.2d at 276.

Where there are material, disputed facts impacting whether a court has personal jurisdiction over a party, *Berthelsen v. Kane*, 759 S.W.2d 831 (Ky. App. 1988) requires a court to hold an evidentiary hearing. In *Berthelsen*, a Nebraska citizen (Berthelsen) filed a breach of contract suit in Kentucky against a citizen of Michigan (Kane) and a business which was incorporated in Michigan but had its principal place of business in Kentucky (Three D. Coal). *Id.* at 831. Both defendants sought dismissal, alleging "the 'minimum contacts' requirement

-14-

between them and Kentucky, necessary for Kentucky courts to exercise personal jurisdiction over them as non-resident defendants under KRS 454.210, had not been met." *Id.*

We held the trial court erred by granting the motion to dismiss based upon conflicting facts. Because of its relevance, we quote *Berthelsen* at length:

These jurisdictional defenses are among the seven permitted to be raised by motion as well as by answer pursuant to CR 12.02. In opting for "by motion" Kane and Three D. Coal also chose the standards to be applied by the trial court in ruling on the motion. These include reading the challenged pleading as a whole and construing any reasonable favorable inference in favor of the plaintiff and to accept as true all material allegations in the complaint.

In ruling on a motion to dismiss on jurisdictional grounds, the trial court, in addition to considering the material allegations in the complaint and construing them as true, is free to hear evidence regarding jurisdiction and to rule on that issue before trial, resolving factual disputes when necessary.

Here the material allegations in the complaint when construed as being true are sufficient to establish the "minimum contact" requirement between Kane and Three D. Coal in the transaction at hand with Kentucky for Kentucky courts to exercise personal jurisdiction over them under KRS 454.210.

No doubt the trial court in arriving at its decision considered and relied on Kane's, Three D. Coal's, and Berthelsen's affidavits in support of their conflicting factual contentions. The affidavits, however, rather than resolving the conflict of facts they contained, merely emphasized the ultimate conflict of fact that existed

-15-

regarding "minimum contacts." An evidentiary hearing at which proof could be presented to resolve the affidavit conflicts should be had to enable the trial court to have an evidentiary basis for its resolution of the conflicts.

In dismissing this action the trial court either ignored the above standards or misapplied them. As a result, at worst it was in error for doing so and at best premature in the absence of an evidentiary hearing. This later defect can be cured by the trial court providing a hearing regarding the facts of "minimum contacts" and considering them . . . in resolving any factual dispute arising from such proof.

*Id.* at 831-32 (citations omitted).

There are two main takeaways from *Berthelsen* relevant here. First, the trial court's conversion of KKR's motion to dismiss based on lack of personal jurisdiction into a motion for summary judgment was improper. In *Berthelsen*, the trial court considered affidavits but did not convert the motion to dismiss for lack of personal jurisdiction to a motion for summary judgment – and we did not instruct it to do so on remand.

Declining to convert a motion to dismiss based on a lack of personal jurisdiction to a motion for summary judgment is supported by CR 12.02, which facially only requires that conversion to occur if "matters outside the pleading are presented to and not excluded by the court" ***and*** the motion "assert[s] the defense that the pleading fails to state a claim upon which relief can be granted . . . ."

-16-

KKR's motion was based on a lack of jurisdiction, not a failure to state a viable claim upon which relief may be granted. Thus, no conversion was necessary.[7]

Nonetheless, Kentucky appellate courts have sometimes approved converting motions to dismiss based on a lack of personal jurisdiction to motions for summary judgment. *See, e.g.*, *Hinners v. Robey*, 336 S.W.3d 891, 893, n.1 (Ky. 2011). In *Hinners*, the Court cited CR 12.02's conversion language but failed to analyze whether that language applied to motions to dismiss based upon an alleged lack of personal jurisdiction. In any event, the precise procedural methodology in *Hinners* did not seem to impact the jurisdictional question. The court unanimously concluded one contract formed on the internet between a Kentuckian and a nonresident to purchase a vehicle was insufficient for a Kentucky court to exercise jurisdiction over a nonresident. *Id.* at 902. In other words, there is no indication that there were any meaningful factual disputes bearing on the jurisdictional questions. Here, by contrast, the trial court admitted

---

[7] Federal courts generally recognize that it is improper to convert motions to dismiss based on an alleged lack of personal jurisdiction into summary judgment motions. 10A *Fed. Prac. & Proc. Civ.* § 2713 (4th ed. 2023) ("In general, courts have ruled that summary judgment is an inappropriate vehicle for raising a question concerning . . . personal jurisdiction . . . . Therefore, although some courts have entered summary judgment on jurisdictional grounds, the general rule is that it is improper for a district court to enter a judgment under Rule 56 for defendant because of a lack of jurisdiction.") (footnotes and citations omitted); *Kerns v. Caterpillar, Inc.*, 583 F. Supp. 2d 885, 891 n.1 (M.D. Tenn. 2008); *Lavrov v. NCR Corp.*, 600 F. Supp. 923, 929 (S.D. Ohio 1984). That approach makes sense because "a court that lacks personal or subject-matter jurisdiction does not have power to enter *any* kind of a judgment – summary or otherwise." *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1012 (D. Minn. 2008).

-17-

that there are disputed evidentiary issues which directly bear on whether KKR is subject to the jurisdiction of Kentucky courts.

Respectfully, we are confident that our Supreme Court would not have converted the motion to dismiss in *Hinners* if the Court had analyzed the precise "conversion" language of CR 12.02. After all, *Hinners* cites *Berthelsen* with approval for the proposition that a court should conduct an evidentiary hearing to resolve disputed jurisdictional facts when resolving a motion to dismiss based on an alleged lack of personal jurisdiction. *See Hinners*, 336 S.W.3d at 895 n.6. And no such conversion occurred in *Berthelsen*. An automatic conversion of a motion to dismiss based upon a lack of alleged personal jurisdiction into a motion for summary judgment – which appears to be what our Supreme Court did *sua sponte* in *Hinners* – would require rewriting CR 12.02 as follows: "If~~, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted,~~ matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." We decline to construe *Hinners* as having silently rewritten CR 12.02.

Our state's highest Court has repeatedly, forcefully held it to *always* be improper to grant summary judgment based upon a court's assessment of the evidence or the credibility of various witnesses or proof. *See, e.g.*, *James Graham*

*Brown Foundation, Inc.*, 814 S.W.2d at 276; *Ogden v. Employers Fire Ins. Co.*, 503 S.W.2d 727, 729 (Ky. 1973). We also have emphasized the same fundamental rule. *See, e.g.*, *Amos v. Clubb*, 268 S.W.3d 378, 382 (Ky. App. 2008). *Hinners* does not discuss that precedent, which therefore remains viable. In short, we do not construe *Hinners* as having required conversion of KKR's motion to dismiss on jurisdictional grounds to a motion for summary judgment.

The second main takeaway from *Berthelsen* relevant here is that the trial court, not this Court, must first resolve disputed, material jurisdictional facts. In *Berthelsen*, we acknowledged that "the material allegations in the complaint when construed as being true are sufficient to establish the 'minimum contact' requirement . . . for Kentucky courts to exercise personal jurisdiction . . . under KRS 454.210." *Berthelsen*, 759 S.W.2d at 832. We similarly acknowledge here that the allegations in the amended complaint, especially when combined with the information obtained by the trial court, would likely suffice to support the exercise of jurisdiction over KKR. But we also acknowledge, as we did in *Berthelsen*, the existence of "conflicting factual contentions[,]" particularly Lee's affidavit. *Id.* So, while there is evidence to support the trial court's conclusion, *Berthelsen* makes clear that we cannot simply affirm.

We would prefer to address the merits of the jurisdictional issue(s) and regret the delay, uncertainty, and additional costs inherent in this remand.

-19-

However, "[a]s an appellate court, we review judgments; we do not make them." *Klein v. Flanery*, 439 S.W.3d 107, 122 (Ky. 2014). We express no opinion on the merits of KKR's motion to dismiss. Instead, we reverse the grant of summary judgment to the OAG and remand the matter to the trial court to conduct an evidentiary hearing regarding the contested jurisdictional facts. After holding the hearing, the trial court shall issue a new decision on KKR's motion to dismiss. That new decision shall not convert the motion to dismiss to a motion for summary judgment. A party aggrieved by a forthcoming final and appealable decision on KKR's motion may seek appropriate appellate relief.[8]

---

[8] The judge who issued the summary judgment decision at issue has subsequently recused. Since a new judge will issue a new decision on KKR's motion to dismiss, KKR's argument that the current decision is fatally flawed because it was issued by a judge who should have recused is moot. Similarly, KKR's argument that reversal is required because the appellate record does not contain all the documents cited by the court is moot. On remand, either party may seek to introduce the evidence it believes is appropriate; a party aggrieved by any future evidentiary rulings generally retains the usual panoply of appellate rights.

Finally, we reject the OAG's argument that KKR's appeal must be dismissed for failure to name indispensable parties in the notice of appeal – the Boone Fund and Prisma. The OAG makes similar indispensable party arguments in the other appeals, which we also reject. As previously stated, the Boone Fund and Prisma each filed their own appeals, which we have joined together with KKR's. Both therefore received notice of this appeal and neither has been obviously prejudiced by not being named as a party in KKR's notice of appeal. *Cates v. Kroger*, 627 S.W.3d 864, 874-75 (Ky. 2021) (declining to dismiss an appeal for failure to name indispensable parties when those entities were made aware of the appeal and suffered no prejudice from being omitted from the notice of appeal). In short, the parties the OAG contends are indispensable have participated in at least one of these combined appeals.

**D.  Propriety of the OAG Seeking Declaratory Relief in Kentucky While Related Actions Are Pending in Other Jurisdictions**

As previously stated, Prisma sued Retirement in Delaware and PAAMCO sued Retirement in California.  The gist of those actions was seeking reimbursement for costs and expenses incurred in *Mayberry*.  It is uncontested the Delaware and California actions were filed before the OAG filed the complaint which led to these appeals.  The question we must answer is whether the prior existence of those actions precluded the OAG from filing this declaratory judgment action.  Under these unique facts, the answer is no.

The OAG argues the extraterritorial suits against Retirement are barred by sovereign immunity.  PAAMCO and Prisma, on the other hand, argue that the OAG could not seek declaratory relief in Kentucky once the extraterritorial actions were filed.[9]  The trial court agreed with the OAG for two main reasons. First, the court held that the Delaware and California actions were not really "prior actions" because they were filed after *Mayberry*, to which they related, had commenced.  Second, the court held Retirement was immune from being sued in extraterritorial courts.  We agree with the trial court's second rationale.

Before we analyze the arguments, we set forth some undisputed facts and applicable legal principles.  Kentucky enjoys sovereign immunity, which

---

[9] We do not construe any other Appellants as having set forth these arguments in their briefs. But, to the extent they intended to do so, our analysis would be equally applicable to them.

generally means "the resources of the state, its income and property, cannot be compelled as recompense for state action that harms a plaintiff through the ordinary suit-at-law process. It is often stated that the state is immune from suit unless there has been an express waiver allowing suit." *Commonwealth v. Kentucky Retirement Systems*, 396 S.W.3d 833, 836 (Ky. 2013). And a court may determine that sovereign immunity has been waived only by an express waiver or "such overwhelming implications from the text as will leave no room for any other reasonable construction." *Id.* (internal quotation marks and citations omitted).

Retirement is an agent of the Commonwealth of Kentucky. Indeed, it is "an integral part of state government." *Kentucky Retirement Systems*, 396 S.W.3d at 837. As such, it "is entitled to immunity under sovereign immunity law unless waived." *Id.* Though an arm of the State, Retirement cannot unilaterally waive its immunity; only the General Assembly may do so. *Ruplinger v. Louisville/Jefferson Cnty. Metro Government*, 607 S.W.3d 583, 585 (Ky. 2020). And as part of its exclusive ability to waive sovereign immunity, the General Assembly may "direct in what manner and in what courts suits may be brought against the Commonwealth." KY. CONST. § 231.

Appellants stress that Retirement's counsel helped draft the agreements at issue. We do not impugn that attorney's good faith efforts to ensure that the agreements comply with Kentucky law. But, respectfully, Retirement's

counsel is not the final immunity arbiter. "The immunity is such that it may not be waived, except by legislative action. Ky. Constitution, § 231. Certainly the constitutional mandate would be of small stature if its precepts could be 'waived' by any state officer or agent other than the general assembly." *Commonwealth, Dept. of Highways v. Davidson*, 383 S.W.2d 346, 348 (Ky. 1964). *See also University of Louisville v. Rothstein*, 532 S.W.3d 644, 647 (Ky. 2017). Thus, the fact that an agent of Retirement believed these contracts complied with Kentucky law is not dispositive, especially since the contracts state that Retirement's obligations are subject to Kentucky law.

And the United States Supreme Court has explicitly held that a state cannot be "sued by a private party without its consent in the courts of a different State." *Franchise Tax Board of California v. Hyatt*, 587 U.S. ___, 139 S. Ct. 1485, 1490, 203 L. Ed. 2d 768 (2019). As the Court explained, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain constitutional limitation[s] on the sovereignty of all of its sister States[,]" including "the inability of one State to hale another into its courts without the latter's consent. The Constitution does not merely allow States to afford each other immunity as a matter of comity; it embeds interstate sovereign immunity within the constitutional design." *Id.* at 1497.

On the other hand, as Prisma and PAAMCO stress, the longstanding general rule in Kentucky is that our Declaratory Judgment Act "was not designed, and is not suitable, for . . . the declaration of the substantive rights involved in a pending suit. Such decisions and declarations must be made in the first instance by the court whose power is invoked and which is competent to decide them." *Jefferson Cnty. ex rel. Coleman v. Chilton*, 236 Ky. 614, 33 S.W.2d 601, 603 (1930). Our Supreme Court reiterated that ancient general rule this century. *Mammoth Medical, Inc. v. Bunnell*, 265 S.W.3d 205, 210 (Ky. 2008).

We question the trial court's conclusion that this action predated the California and Delaware actions simply because all of them relate to *Mayberry*, which was filed first and remained ongoing when those extraterritorial actions were filed. The substantive legal issues in the various offshoots from *Mayberry* are not the same. In *Mayberry*, the main issue was allegedly improper conduct by the investment firms. That issue is absent from the extraterritorial actions against Retirement. The main substantive issue in those actions is indemnification; that issue is mostly, if not entirely, absent from *Mayberry*.

A declaratory judgment action generally may not be filed if it asks for a "declaration of the substantive rights involved in a pending suit." *Chilton*, 33 S.W.2d at 603. Since *Mayberry* did not involve the same "substantive rights" at issue in the extraterritorial actions, the fact that it preceded them is not dispositive.

Nonetheless, we agree with the trial court that this action was permissible since Retirement is entitled to immunity in the extraterritorial actions. Our analysis differs from the trial court's, but we may affirm "on other grounds as long as the lower court reached the correct result." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 576 (Ky. 2009). We review whether a party is entitled to immunity *de novo*. *Ohio v. Great Lakes Minerals, LLC*, 597 S.W.3d 169, 171 (Ky. 2019).

So, the core question becomes whether or not the General Assembly waived sovereign immunity for Retirement on breach of contract claims. We conclude it did but only for actions filed in the Franklin Circuit Court.

To explain that conclusion, we must examine KRS 61.645 and KRS 45A.245. KRS 61.645(2)(a) permits Retirement "[t]o sue and be sued in its corporate name . . . ." The United States Supreme Court has held that a statute permitting a state to "sue and be sued" did not, standing alone, waive the state's immunity from suit in federal court. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676, 119 S. Ct. 2219, 2226, 144 L. Ed. 2d 605 (1999). Our Supreme Court similarly held that "sue and be sued" language in a statute "is inadequate, on its own, to exhibit a legislative intent to waive immunity on behalf of a governmental agency." *Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 850 (Ky. 2019).

We reached a similar result decades ago in *University of Louisville v. Martin*, 574 S.W.2d 676, 678-79 (Ky. App. 1978). Particularly relevant here, we rejected an argument that a state University could unilaterally waive its immunity in its charter. *Id. Martin* reinforces our conclusion that Retirement could not validly waive its inherent immunity, regardless of any contractual language purporting to do so.

In sum, the "sue and be sued" language in KRS 61.645 cannot bear the heavy weight placed upon it by Appellants. A layperson would likely think that a statute allowing a state entity to "sue and be sued" would allow it to do just that: be subject to suit like any other person or corporate entity. But precedent compels a different conclusion. Therefore, though we strive to afford statutes their plain meaning, the "sue and be sued" language in KRS 61.645(2)(a) did not, by itself, waive Retirement's immunity.

However, that cannot be the end of the immunity analysis. When Retirement entered into its contracts with Appellants, KRS 61.645(2)(d) gave Retirement the authority to "contract for investment counseling, actuarial, auditing, medical, and other professional services as required to carry out the obligations of the board without limitation, notwithstanding the provisions of KRS Chapters 45, 45A, 56, and 57 . . . ." Similarly, at that time, KRS 61.645(2)(f) gave Retirement the express authority to "hold, sell, dispose of, pledge, lease, or mortgage, the

goods or property necessary to exercise the board's powers and perform the board's duties without limitation, notwithstanding the limitations of KRS Chapters 45, 45A, and 56 . . . ."  In 2017, the General Assembly amended KRS 61.645 and expressly made the Board's authority to contract and use its property "subject" to the provisions of KRS Chapter 45A.[10]

_____

[10] Specifically, KRS 61.645 now provides in relevant part:

> (2) The board is hereby granted the powers and privileges of a corporation, including but not limited to the following powers:
>
> > (a) To sue and be sued in its corporate name;
> >
> > . . .
> >
> > (d) Except as provided in KRS 61.650(6), to contract for investment counseling, auditing, medical, and other professional or technical services as required to carry out the obligations of the board subject to KRS Chapters 45, 45A, 56, and 57. . . .
> >
> > . . .
> >
> > (f) Except as provided in KRS 61.650(6), to acquire, hold, sell, dispose of, pledge, lease, or mortgage, the goods or property necessary to exercise the board's powers and perform the board's duties subject to KRS Chapters 45, 45A, and 56[.]

KRS 61.645 was amended in 2017, 2019, 2020, 2021, 2022, and 2023.  Those amendments do not materially impact the above-quoted sections.

> KRS 61.650(6), referenced in KRS 61.645(2), provides:
>
> All contracts for the investment or management of assets of the systems shall not be subject to KRS Chapters 45, 45A, 56, and 57.  Instead, the board shall conduct the following process to develop and adopt an investment procurement policy with which all prospective contracts for the investment or management of assets of the systems shall comply:
>
> > (a) On or before July 1, 2017, the board shall consult with the secretary of the Finance and Administration Cabinet or his or her designee to develop

And KRS 45A.245(1) provides:

Any person, firm or corporation, having a lawfully authorized written contract with the Commonwealth at the time of or after June 21, 1974, may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both. **Any such action shall be brought in the Franklin Circuit Court** and shall be tried by the court sitting without a jury. All defenses in law or equity, except the defense of governmental immunity, shall be preserved to the Commonwealth.

---

an investment procurement policy, which shall be written to meet best practices in investment management procurement;

(b) Thirty (30) days prior to adoption, the board shall tender the preliminary investment procurement policy to the secretary of the Finance and Administration Cabinet or his or her designee for review and comment;

(c) Upon receipt of comments from the secretary of the Finance and Administration Cabinet or his or her designee, the board shall choose to adopt or not adopt any recommended changes;

(d) Upon adoption, the board shall tender the final investment procurement policy to the secretary of the Finance and Administration Cabinet or his or her designee;

(e) No later than thirty (30) days after receipt of the investment procurement policy, the secretary or his or her designee shall certify whether the board's investment procurement policy meets or does not meet best practices for investment management procurement; and

(f) Any amendments to the investment procurement policy shall adhere to the requirements set forth by paragraphs (b) to (e) of this subsection.

(Emphasis added.) *Shall* "is mandatory . . . ." KRS 446.010(39).

Frankly, KRS 61.650 is not a paradigm of clarity when compared to KRS 61.645 vis-à-vis the application of KRS Chapter 45A. We agree with the Appellants that Retirement is sometimes exempted from the requirements of the Kentucky Model Procurement Code found in KRS Chapter 45A. But that exemption applies to Retirement making some investment decisions, as shown by KRS 61.650 repeatedly referring to "procurement" of investments. We agree with the OAG's brief that argues KRS 61.650 does not state "what to do if an agency breaches and the vendor wants to bring a claim for that breach. So, whether [Retirement] had to follow the Model Procurement Code in entering its contract with [Appellants] is irrelevant to whether [Appellants'] claim against [Retirement] is subject to KRS 45A.270."

In short, Retirement did not have to comply with all provisions in KRS Chapter 45A when contracting with the Appellants but that does not mean that all of KRS Chapter 45A is inapplicable to Retirement. After all, the only reason Retirement is not immune from breach of contract actions is because the General Assembly waived sovereign immunity in KRS 45A.245. And KRS 45A.245 "is an unqualified waiver of immunity **in all cases** based on a written contract with the Commonwealth, including but not limited to employment contracts. We hold that this immunity is *not* limited to contracts entered into

pursuant to the KMPC . . . ." *Rothstein*, 532 S.W.3d at 647 (emphasis added). KRS 45A.270(1), which generally requires judgments against the State to be paid from the general fund, applies to "[e]ach agency which has had an award or judgment against it upon a claim filed pursuant to KRS 45A.240 to 45A.270 . . . ." Since all breach of contract claims against the State are based upon KRS 45A.245, the claims by the Appellants here are made "pursuant to KRS 45A.240 to 45A.270[.]" Thus, we reject Appellants' arguments that KRS 45A.270 is inapplicable. And requiring judgments against Retirement to be paid from the general fund has constitutional implications, as we shall later see.

Therefore, KRS 45A.245 is a waiver of "governmental immunity on *all* claims brought by *all* persons on *all* lawfully authorized written contracts with the Commonwealth." *Rothstein*, 532 S.W.3d at 651. Or, as our Supreme Court very recently explained, KRS 45A.245 is "a general, unqualified waiver of immunity for all written contracts" involving a state entity. *University of Kentucky v. Regard*, 670 S.W.3d 903, 911 (Ky. 2023) (plurality opinion of three justices with a fourth concurring in result only).

However, the waiver in KRS 45A.245(1) is plainly conditioned upon the breach of contract suit being brought in the Franklin Circuit Court. Such a venue restriction is permissible since § 231 of the Kentucky Constitution gives the General Assembly the discretion to "direct in what manner **and in what courts**

-30-

suits may be brought against the Commonwealth." (Emphasis added.) *See also River City Fraternal Order of Police Lodge 614, Inc. v. Kentucky Retirement Systems*, 375 F. Supp. 3d 748, 769 (E.D. Ky. 2019) ("a State can waive immunity by statute as to one forum and not another . . . . KRS § 45A.245 only waives the State's immunity in state court, specifically Franklin Circuit Court."), *aff'd in part and vacated and remanded in part on grounds not germane here by River City Fraternal Order of Police Lodge 614, Inc. v. Kentucky Retirement Systems by and through Board of Trustees*, 999 F.3d 1003 (6th Cir. 2021).

So, if it is clear that the breach of contract suits filed by PAAMCO and Prisma must – at least as of 2017 – be filed in the Franklin Circuit Court, what is there left for us to decide on this issue since it is unquestionable that PAAMCO's and Prisma's extraterritorial suits were filed after that date? PAAMCO and Prisma argue they were not required to sue Retirement in the Franklin Circuit Court until KRS 61.645 was amended in 2017; in other words, the core of their argument is that they are free to sue Retirement in accordance with their contracts since the Franklin Circuit Court restriction did not exist when those deals were executed. As did the trial court, we disagree.

First, we agree with the Commonwealth that the forum limitation clause in KRS 45A.245 applied to Retirement even prior to 2017. KRS 45A.245 was enacted in 1978, well before the contracts at issue were executed, and it has

not been subsequently amended. Under longstanding general Kentucky precedent, "contracts of public bodies, like those of individuals, are made with reference to existing statutes and [those] statutory provisions enter into the contracts by operation of law." *Moore v. Babb*, 343 S.W.2d 373, 376 (Ky. 1960). KRS 45A.245 contains all-encompassing language which makes plain that its provisions apply to *all* contracts involving the Commonwealth. *Rothstein*, 532 S.W.3d at 647. Thus, because KRS 45A.245 significantly predated the contracts at issue, it "enter[ed] into the contracts [at issue] by operation of law." *Moore*, 343 S.W.2d at 376.

Moreover, both we and our Supreme Court held **prior to 2017** that KRS 45A.245 was a waiver of the State's immunity on breach of contract claims. In fact, one of those pre-2017 cases involved Retirement. *Kentucky Retirement Systems*, 396 S.W.3d at 838; *Commonwealth v. Samaritan All., LLC*, 439 S.W.3d 757, 762 (Ky. App. 2014). Our Supreme Court held in 2017 that a dispute about an employment contract with a public university entered into in 2000 was subject to the provisions of KRS 45A.245, regardless of whether the contract was subject to the remainder of KRS Chapter 45A. *Rothstein*, 532 S.W.3d at 647.

The 2017 amendments to KRS 61.645 thus codified what was already required under Kentucky precedent: KRS 45A.245 applies to breach of contract claims against the Commonwealth and its applicable components for every

-32-

contract executed after June 21, 1974. These contracts are no exceptions. And KRS 45A.245 allows breach of written contract claims against the state to be brought **_only_** in the Franklin Circuit Court.

Second, PAAMCO and Prisma sued Retirement for breach of contract in Delaware and California *after* the 2017 amendments to KRS 61.645 at issue. The forum restriction in KRS 45A.245 is especially applicable to Prisma, as it admits there is not a forum selection clause in its contractual arrangements with Retirement.[11] And the relevant contracts contain explicit language unsurprisingly stating, essentially, that Retirement's obligations are subject to Kentucky law.[12]

In short, Retirement agreed to the jurisdiction of California courts for its disputes with PAAMCO. But it did not have the power to allow itself, as an integral component of the Commonwealth of Kentucky, to be haled into court in a foreign state by a private party. The General Assembly – and only the General Assembly – may waive Kentucky's immunity. Since there is nothing to indicate the General Assembly has allowed Retirement to be sued in foreign courts by

---

[11] The agreement provides that it is governed by Delaware law but does not facially require actions to be brought in Delaware.

[12] For example, Retirement's subscription agreement with PAAMCO regarding the Newport Colonels, LLC provides in relevant part that "[**t**]**o the extent permissible under applicable law**, [Retirement] hereby irrevocably agrees that any suit, action or proceeding with respect to this Subscription Agreement and its investment . . . may be brought in U.S. federal and state courts in the State of California." R. at 159 (Emphasis added.)

-33-

private parties, any contrary language in these contracts must yield. Kentucky law is clear: the state and its applicable components may be sued for breach of contract **_only_** in the Franklin Circuit Court, so the breach of contract actions filed against Retirement in Delaware and California were improper.

We decline to unduly lengthen this lengthy Opinion by further analyzing the parties' sundry arguments on this issue. We have considered, but reject, all arguments contrary to our conclusion that any breach of contract claims must be brought against Retirement in the Franklin Circuit Court. Accordingly, the extraterritorial actions were improper, and their existence did not prevent the OAG from filing the underlying declaratory judgment action.[13]

### E. § 50 of the Kentucky Constitution

Having cleared the immense procedural underbrush, we now address the substantive core of these appeals: do the indemnification clauses violate § 50 of the Kentucky Constitution? We agree with the trial court that they do.

Our analysis begins with the text of the Constitution. "The basic rule . . . is to interpret a constitutional provision according to what was said and not what might have been said; according to what was included and not what might

---

[13] Obviously, we respectfully disagree with the Orange County, California Superior Court's conclusion that sovereign immunity did not bar PAAMCO from suing Retirement in California. The superior court's decision was affirmed on appeal, but on different grounds not germane to the issues before us. *Paamco Prisma, LLC v. Board of Trustees of Kentucky Retirement Systems*, 2022 WL 3593349, at *5 (Cal. Ct. App. Aug. 23, 2022) (unpublished).

have been included." *Pardue v. Miller*, 306 Ky. 110, 115, 206 S.W.2d 75, 78 (1947). So, "[w]hen interpreting constitutional provisions, we look first and foremost to the express language of the provision, and words must be given their plain and usual meaning." *Westerfield v. Ward*, 599 S.W.3d 738, 747 (Ky. 2019) (internal quotation marks and citations omitted).

It is difficult to give a plain language, literal interpretation to the stilted, grammatically idiosyncratic language of Section 50. That section exemplifies the language and stylistic approach of a bygone era as it consists of one sentence which contains over one hundred words, seven commas, a semicolon, and a colon:

> No act of the General Assembly shall authorize any debt to be contracted on behalf of the Commonwealth except for the purposes mentioned in Section 49, unless provision be made therein to levy and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it: Provided, The General Assembly may contract debts by borrowing money to pay any part of the debt of the State, without submission to the people, and without making provision in the act authorizing the same for a tax to discharge the debt so contracted, or the interest thereon.

And § 49 of our Constitution, referenced in § 50, uses a similar stylistic approach:

The General Assembly may contract debts to meet casual deficits[14] or failures in the revenue; but such debts, direct or contingent, singly or in the aggregate, shall not at any time exceed five hundred thousand dollars, and the moneys arising from loans creating such debts shall be applied only to the purpose or purposes for which they were obtained, or to repay such debts:  Provided, The General Assembly may contract debts to repel invasion, suppress insurrection, or, if hostilities are threatened, provide for the public defense.

As we perceive it, the crux of the dispute here is whether the indemnity clauses at issue are *debts* in the constitutional sense.  Like the trial court, we answer that question "yes."  Because the answer may be ascertained by applying Kentucky law, we decline to address the extraterritorial authority cited by the parties.

In common parlance, a *debt* is merely "something owed . . . ." *Debt*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/debt (last visited Sep. 21, 2023).  A  leading legal dictionary similarly defines *debt* in relevant part as "a specific sum of money due by agreement or otherwise . . . ." *Debt*, BLACK'S LAW DICTIONARY (11th ed. 2019).  But not every single dollar ever "owed" by the state is considered a *debt* for

---

[14] A *casual deficit* is "[a]n unforeseen shortfall of funds." BLACK'S LAW DICTIONARY (11th ed. 2019).  Kentucky's then-highest Court expounded on that archaic term as follows:  "'Casual deficits,' . . . means 'a deficit' or 'deficits,' happening by chance or accident, and without any design to avoid the constitutional inhibitions of the state against incurring an unauthorized expenditure of the state's funds above a certain amount." *State Budget Comm'n v. Lebus*, 244 Ky. 700, 51 S.W.2d 965, 969 (1932).  In sum, a *casual deficit* occurs when a taxing body takes an unduly "optimistic view of [future] tax collections" when enacting a budget. *Letcher Cnty. Bd. of Educ. v. Bank of Whitesburg*, 271 Ky. 166, 111 S.W.2d 656, 657 (1937).

constitutional purposes.  Indeed, as one law professor persuasively notes, "state governments seek ways around their constitutional limitations on taxation and finance" such that, sometimes, "[a] debt is not really a debt . . . ."  Susan P. Fino, *A Cure Worse Than the Disease? Taxation and Finance Provisions in State Constitutions*, 34 Rutgers L.J. 959, 1010-11 (2003).[15]

Under settled precedent, an obligation is a *debt* under §§ 49 and 50 only if the obligation "bind[s] the commonwealth to pay it by the levy and collection of general taxes . . . .  A contingent liability is not within the meaning of the Constitution fixing *debt* limit."  *Lebus*, 51 S.W.2d at 969.  Or, stated somewhat differently, "[a] debt in the constitutional sense arises out of a contract wherein the creditor is unconditionally entitled to receive and the debtor is obligated to pay."  *Preston v. Clements*, 313 Ky. 479, 487, 232 S.W.2d 85, 90 (1950).  That

---

[15] By way of an illustrative example, Kentucky's then-highest Court stated that the word *debt* as used in §§ 49 and 50 our Constitution should be afforded its everyday meaning, which it used a dictionary to define as "something owed . . . ."  *Crick v. Rash*, 190 Ky. 820, 229 S.W. 63, 68 (1921).  But the Court then performed an about-face and said that some obligations "although amounting to a technical debt" are "not forbidden" by the Kentucky Constitution.  *Id.* at 69.  Thus, Professor Fino was correct.  As illustrated by precedent, it is not always obvious whether an obligation of the state is a *debt* for purposes of analyzing a state's constitutional debt limit.

Also, we are keenly aware of the harsh criticism of constitutional debt limits made by many scholars.  Particularly relevant here, one professor opined that the underfunding of state pensions is among the "pernicious consequences" directly stemming from such debt limits.  Richard C. Schragger, *Democracy and Debt*, 121 Yale L.J. 860, 869 (2012).  *See also, e.g.*,  Amy B. Monahan, *State Fiscal Constitutions and the Law and Politics of Public Pensions*, 2015 U. Ill. L. Rev. 117 (2015).  Whether the ancient $500,000 debt limit in Kentucky should be raised, or abolished, is beyond the scope of this Opinion.  "The court has nothing to do with the wisdom or expediency of any constitutional or statutory enactment."  *Pardue*, 206 S.W.2d at 78.

unconditional obligation by the state as a debtor is precisely what occurred here because the State is irrevocably required to make up any shortfalls by Retirement.

Though nearly fifty years old, the leading case on what constitutes a debt under §§ 49 and 50 is *McGuffey v. Hall*, 557 S.W.2d 401 (Ky. 1977). Due to its importance to these cases, we shall discuss *McGuffey* in depth.

*McGuffey* involved the constitutionality of legislation which created a state fund for medical malpractice claims. *Id.* at 408. Physicians and hospitals were required to contribute to the fund, whose funds would be used to pay malpractice claims – but the general fund would be responsible for making payments if the fund could not. *Id.*

Among the issues decided by our Supreme Court was whether that contingent financial guarantee by the Commonwealth violated § 50. The Court unanimously answered "yes." But what is germane here is the rationale, not the answer, as *McGuffey* provides the most straightforward judicial explanation to date of what is prohibited by § 50 (and, as we shall later see, § 177):

> It does seem to us that by this time, with all of the cases that have been decided under Const. s[ection] 50, its simple message should be clear to all. No commitment against future general revenues can be made without a vote of the people. This is nothing less than the keystone guaranty of the state's fiscal responsibility. No agency of the state, including its legislature, can place an obligation against the general funds otherwise available for appropriation and expenditure by a future legislature. . . . [T]he restriction of Const. s[ection] 50 against

-38-

obligating future general revenues is not satisfied by substituting other assets equal in value to the forbidden encroachment. As we see it, the purpose of Const. s[ection] 50 is to see that each generation is left free to make its own trades with its own money.

*Id.* at 409-10 (paragraph break omitted). We agree with the trial court that the indemnity clauses at issue do not leave future generations free to make their own trades with the state's money.

Expounding on the "commitment against future revenues" concept discussed in *McGuffey*, our Supreme Court explained later that "[i]t is the assurance that the legislature would provide for funding in future appropriations which has been most offensive to this Court." *Hayes v. State Property and Bldgs. Comm'n*, 731 S.W.2d 797, 800 (Ky. 1987). On the other hand, if funding is "clearly at the mercy of the Kentucky legislature[,]" Kentucky courts have generally upheld plans which call for the expenditure of future state funds. *Id.* at 801.

Here, the indemnity clauses are not dependent on the mercy of future sessions of the General Assembly. Retirement is an arm of the State. The General Assembly cannot break its inviolable contract with many members of Retirement. So, if Retirement lacks funds to pay its retirees, the general fund will have to be tapped to cover any shortfall. Consequently, we agree with the trial court that if Retirement depletes its funds by indemnifying Appellants (bearing in mind the lack

of any express ceiling on the potential amount of such indemnification in these contracts), the General Assembly would be required to tap the general fund to pay retirees pursuant to the inviolable contract. That is the harsh financial reality, not a mere attenuated daisy chain, as Appellants argue.[16]

Contrary to the Appellants' arguments, the secondary nature of the State's obligation here does not immunize it from running afoul of § 50. In

---

[16] As our Supreme Court explained in *Mayberry*, the unique funding arrangement combined with the "inviolable contract" between certain Retirement members and the Commonwealth creates a situation where state funding is at risk if Retirement is insolvent. Specifically,

> relying on any increased risk of not receiving pension benefits in the future poses a problem in this case: as KRS beneficiaries, Plaintiffs' retirement benefits are part of a statutorily declared "inviolable contract" between KRS members and the Commonwealth. Should KRS become so severely underfunded that it runs out of assets and terminates, the Plaintiffs are still entitled to their pension benefits under their inviolable contract with the Commonwealth. And even before the risk of plan termination is realized, the Commonwealth has the authority to increase its own contribution to the KRS plan to make up any actuarial shortfall in its assets. In essence, then, the full faith and credit of the Commonwealth serves as a backstop for Plaintiffs' pension benefits even in the event that severe plan mismanagement renders KRS insolvent.

*Mayberry*, 603 S.W.3d at 253-54 (footnotes omitted). Given that unique funding and unbreakable promise by the Commonwealth, we generally agree with the OAG that:

> if [the Boone Fund] exhausts its current accounts indemnifying others and cannot return all of the Commonwealth's assets, the Commonwealth must still pay those [retirement] benefits. And that means that if [Retirement] cannot pay out the required benefits in 2023 because of an indemnity obligation to [Appellants] that [Retirement] created in 2011, the funds *must* be appropriated by the General Assembly . . . .

Appellee Brief, p. 18 in No. 2022-CA-0350-MR.

-40-

*Preston*, Kentucky's then-highest Court quoted with approval a Florida case as follows:

> In *Brash v. State Tuberculosis Board*, 124 Fla. 652, 169 So. 218, 219, may be found this pertinent language: 'Only where it can be clearly demonstrated **beyond a reasonable doubt** that a contemplated scheme of embarkation upon new capital ventures will not immediately or mediately, presently or in futuro, directly **or contingently**, operate to impose an added burden on the taxing power, or have the effect of impairing the public credit in futuro, will the consummation of such a debt incurring scheme be held authorized, absent the approving voice of the freeholders . . . . And, in the case of enterprises authorized by the Legislature to be embarked upon through state agencies, a particular scheme of financing will be held to be valid only where it is clearly demonstrable from the specific terms of the financing proposal itself that **no tax burden** or pecuniary liability of the state to appropriate or pay for the indebtedness about to be incurred **will ever arise**, or be looked to as security, in whole or in part, for repayment of the borrowed moneys.'

*Preston*, 232 S.W.2d at 90 (emphasis added). It is not certain beyond a reasonable doubt that the State would never have to tap the general fund in the future due to the potentially limitless indemnity costs inherent in these contracts. Similarly, in *McGuffey*, our Supreme Court held that "[l]ike Const. [section] 50 . . . the 'credit' provision of Const. [section] 177 seeks to prevent transactions that **might result** in future liabilities against the general resources of the state and thereby encroach upon the freedom of another generation to utilize those resources as it then deems necessary or appropriate." *McGuffey*, 557 S.W.2d at 411 (emphasis added). In

-41-

sum, the "backstop" nature of the general fund's obligations does not exempt these agreements from being constitutionally infirm.

Also, as the trial court cogently held, there is no obvious limit "imposed on the temporal reach of the 'reimbursement' provisions [Appellants] seek to invoke . . . [and] the parties are well-beyond the fiscal biennium that was current at the time the contracts were executed in 2011." In other words, the agreements, as written, could bind the financial hands of distant future sessions of the General Assembly. And we held long ago that a state agency would violate § 50 if it agreed to a contract which would impose future liabilities against the general fund. *City of Shelbyville ex rel. Shelbyville Mun. Water and Sewer Comm'n v. Commonwealth, Nat. Resources and Environmental Protection Cabinet*, 706 S.W.2d 426, 430 (Ky. App. 1986).

We must briefly address the Boone Fund, as its indemnification clause is different to the extent that it requires indemnity to be paid by the assets of the Boone Fund, not the separate assets of Retirement. Indeed, the Boone Fund is holding well over $130,000,000 in reserve for indemnification purposes. Appellants tout the Boone Fund's status as an LLC but ignore the practical reality: the Boone Fund's assets are almost entirely derived from Retirement and remain needed assets of the Commonwealth.

Of course, an LLC, such as the Boone Fund, is considered to be a legally distinct entity from its members. *See, e.g.*, *Turner v. Andrew*, 413 S.W.3d 272, 275 (Ky. 2013). Nonetheless, we agree with the OAG's argument in its brief "money from the general fund moved from [Retirement's] control to [the Boone Fund's] – but it remained the assets that the Commonwealth needed to pay its pension obligations." If the Boone Fund "use[d] the investment returns it earned on the Commonwealth's assets . . . to pay its indemnity obligations" it would deprive Retirement of funds it would otherwise receive and could "use to pay the guaranteed pension benefits to its retirees."

We agree that "whether [the Boone Fund] is holding the initial capital investments or simply the earnings on [them] is irrelevant. [The Boone Fund] is holding a substitute for general fund dollars that it plans on using to indemnify Prisma." In short, for purposes of § 50, we reject Appellants' arguments that the funds at issue are not state funds simply because they are currently controlled by the Boone Fund.

We agree with the trial court that *McGuffey* forecloses the Boone Fund's argument. Under *McGuffey*, "the restriction of Const. [section] 50 against obligating future general revenues is not satisfied by substituting other assets equal in value to the forbidden encroachment." *McGuffey*, 557 S.W.2d at 410. The assets held by the Boone Fund are substitutes for Retirement's assets. As the trial

-43-

court concluded, § 50 prohibits "both direct and indirect encroachment on future revenues. . . . [I]f [Retirement] itself would be prohibited from encroaching on future revenues, then it seems logical that an entity in which it owns substantially all of the ownership interest would be subject to similar limitations."

It is beyond reasonable dispute that a diminution in the money Retirement possesses increases the likelihood the General Assembly will be required to allocate general fund revenues to retirees pursuant to the inviolable contract. The tens of millions held by the Boone Fund for indemnification are not available to Retirement. Thus, the fact that the Boone Fund's agreement states that the indemnification must be paid solely out of the Boone Fund's assets is not determinative. Retirement contributed the vast majority of the money which eventually led to the assets currently held by the Boone Fund. Retirement needs to maximize its financial assets to pay its members. After all, increasing Retirement's assets was the entire point Retirement invested with the Appellants. If Retirement cannot pay its members with its own funds, then the State must do so. And the large amount of money held by the Boone Fund is vastly above a *de minimis* amount which would likely have no impact on Retirement's bottom line.

We also reject the Appellants' argument(s) that the indemnity clauses are routine breach of contract clauses. We generally agree with BAAM's assertion that "Sections 50 and 177 are not meant to limit a state agency's ability to promise

-44-

to its contractual counterparties . . . that it will pay damages resulting from its own breach of contract." But we disagree that the indemnity clauses at issue only serve that narrow purpose.

The indemnity clauses go beyond the scope of a typical breach of contract provision. Two examples will highlight our conclusion. First, the subscription Agreement for the Clay Fund obligates Retirement to pay "**any and all** claims, demands, losses, damages, costs and expenses **whatsoever**" incurred by BAAM and the Clay Fund "arising directly as a result of any material breach" by Retirement. That sweeping language is no run-of-the-mill breach of contract provision. Second, the Boone Fund's LLC agreement entitles Prisma to be indemnified from the Boone Fund's assets (which, again, were chiefly provided by Retirement) for "**any and all** loss, liability and expense (including, **without limitation**, reasonable legal and expert witness fees and expenses" which Prisma "incurred **in connection with** investigating, preparing for and/or defending against any claim, action, suit or proceeding, threatened or commenced . . . to the extent arising from the good faith performance by [Prisma] . . . ." (emphasis added). That breathtakingly broad language does not even require the expenses to have been directly caused by Retirement's breach – it permits recovery of costs merely

-45-

connected to such a breach. As such, the clause goes well beyond an ordinary breach of contract provision.[17]

And we must stress that the costs and expenses for which Appellants seek reimbursement were incurred due to the unilateral act of third parties – the plaintiffs who filed the *Mayberry* action. It is nigh impossible to discern how any misstatement(s) by Retirement about its investment prowess led to the filing of the *Mayberry* action – *i.e.*, how would a misstatement by Retirement have caused the *Mayberry* plaintiffs to allege that Appellants engaged in misconduct? Phrased differently, how would any misstatement by Retirement be a "material" breach which led to Appellants incurring the costs for which they seek reimbursement? The entire thrust of *Mayberry* is that Appellants engaged in misconduct. Thus, by seeking reimbursement for their *Mayberry*-induced costs, Appellants want Retirement to reimburse them for costs incurred because third parties asserted that Appellants failed to treat Retirement fairly and properly. As the OAG cogently posits, even assuming that Retirement erroneously inflated its investment acumen

---

[17] Without belaboring the point, the vast language of the indemnity clauses appears facially to allow Appellants to seek "any and all" types of damages. "It is well established in this jurisdiction that the measure of damages for breach of contract is that sum which will put the injured party into the same position he would have been in had the contract been performed." *Perkins Motors, Inc. v. Autotruck Federal Credit Union*, 607 S.W.2d 429, 430 (Ky. App. 1980) Thus, some limited types of damages are generally not recoverable in breach of contract actions. *See* Ronald W. Eades, *Measure of damages generally*, Ky. L. of Damages § 18:1 (2023). But the limitless "any and all" language, taken at face value, would permit Appellants to seek damages not typically permitted in breach of contract actions.

in the agreements, "that does not mean the *Mayberry* action arose directly from [Retirement's misstatement]. How could it when the *Mayberry* plaintiffs alleged that *the hedge-fund managers* mismanaged the funds and breached fiduciary duties?"

Of course, "every word, phrase or term of a contract must be given effect. An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." 11 *Williston on Contracts* § 32:5 (4th ed. 2023). A provision doing nothing but regurgitating the law generally allowing Retirement to be sued for breach of contract (again, only in the Franklin Circuit Court) would be superfluous or useless. As the OAG asks: "if the reimbursement provision does nothing more than codify ordinary breach-of-contract damages, why is it necessary at all?"

Because the contracts at issue do not contain mere typical breach of contract clauses, we also reject Appellants' overwrought arguments that affirming the trial court would destroy the ability of any state agency to enter into future contracts. Our narrow holding is that these virtually limitless indemnity provisions are unconstitutional and thus unenforceable. We are confident that the State and the applicable subdivisions thereof will be able to enter into future contracts.

First, entities who contract with the State are not left defenseless against a breach by the State. In such an instance, the entity contracting with the

State may sue the State for breach of a written contract in the Franklin Circuit Court. *See, e.g.*, *Appalachian Stream Restoration, LLC v. Kentucky*, No. 3:17-cv-00103-GFVT, 2019 WL 1005196, at \*4 (E.D. Ky. Mar. 1, 2019) (unpublished) ("It is undoubtedly frustrating to discover that the contract provision that seemed so clear and unambiguous, is in fact, unenforceable in federal court. But ASR is not without a remedy. The doors of the Franklin Circuit Court are open to ASR, at least as to its contractual claims, by way of valid waiver of sovereign immunity, executed by the General Assembly.") (cited only as an illustrative example). Second, the inviolable contract is generally not applicable to contracts entered into by other state entities. In that sense, Retirement is unique. But here, the General Assembly has an unbreakable bond with many of its retirees, so it has an unflagging, unavoidable, nondiscretionary obligation to step in when Retirement lacks funds.

Finally, we reject Appellants' hyperbolic arguments that affirming the trial court will destroy the existence of the LLCs or void the entirety of the agreements at issue. Under Delaware law, the basis for forming an LLC is an agreement. 6 Del. Code Ann. § 18-101(9) ("'Limited liability company agreement' means any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise) . . . of the member or members as to the affairs of a limited liability company and the conduct of its

-48-

business."). Of course, an LLC agreement cannot violate applicable law. *XRI Investment Holdings LLC v. Holifield*, 283 A.3d 581, 656 (Del. Ch. 2022), *affirmed in part, reversed in part, and remanded by Holifield v. XRI Investment Holdings LLC*, ___ A.3d ___, 2023 WL 5761367 (Del. Sep. 7, 2023) (opinion not yet final) ("if an LLC lacks the statutory power to engage in a particular act, then the act is void *ab initio*."). Retirement cannot validly agree to violate Kentucky law. The indemnity clauses are unenforceable, but the remainder of the contracts is unaffected due to their severability clauses, as aptly argued in Appellee's brief: "But an LLC like [the Boone Fund] can only be formed under Delaware or Kentucky law after an 'agreement' between different parties . . . . But the point here is that [Retirement] had no authority to agree to any of the indemnity contract terms . . . under Sections 50 and 177 . . . . So the indemnity clauses are not enforceable."

We decline to belabor this issue further. We reject the Appellants' arguments to the contrary and affirm the trial court's conclusion that the indemnity clauses violate § 50 of the Kentucky Constitution.

### F. § 177 of the Kentucky Constitution

We also agree with the trial court that the indemnity clauses violate § 177. But "[r]ealizing that the patience of the reader whose sturdy horse Perseverance has carried him to this point must be wearing thin, we shall deal with

[this issue] briefly[.]" *McGuffey*, 557 S.W.2d at 414. The gist of the disagreement(s) here is whether the indemnity clauses involve pledging the credit of the Commonwealth.[18]

Once again, the clearest explanation of § 177 comes from Justice Palmore's opinion for a unanimous court in *McGuffey*:

> whether the objects of an expenditure are "public" or otherwise is irrelevant to Const. s[ection] 177 . . . . Here . . . the [medical malpractice] Fund is underwritten by a guaranty in which the general funds of the state derivable from future tax revenues are made the surety. If becoming a surety does not amount to a lending of credit, then there cannot be such a thing . . . . Const. s[ection] 177 does not permit the state's credit to be given or lent for any purpose, public or otherwise. . . . [T]he listing of entities to which the state's credit may not be given was intended to be all-inclusive. . . .
>
> In 1891 the kind of governmental administrative agency that is so prevalent today was virtually unknown, and it would not have occurred to the members of the Convention that there might be a need to prohibit using the credit of the state for the benefit of one of its own administrative agencies. But the purpose is clear. Like Const. s[ection] 50, which we have already discussed at some length, the "credit" provision of Const. s[ection] 177 seeks to prevent transactions that might result in future liabilities against the general resources of the state

---

[18] Section § 177 prevents the Commonwealth from becoming "an owner or stockholder" in a "company, association or corporation . . . ." Retirement, an arm of the Commonwealth, is a member of (*i.e.*, has an ownership stake in) the Boone Fund and the Clay Fund, each of which is an LLC. Although at first blush those ownership interests could be deemed to violate § 177, seventy years ago Kentucky's then-highest Court held that portion of § 177 "is directed to the Commonwealth as such and not to an agency" thereof. *City of Louisville Municipal Housing Commission v. Public Housing Administration*, 261 S.W.2d 286, 287 (Ky. 1953).

and thereby encroach upon the freedom of another generation to utilize those resources as it then deems necessary or appropriate. It is a "clincher," making certain that if perchance some court might hold a contingent or secondary liability not to be a "debt" under Const. s[ection] 50, it would nevertheless fall under the interdict of Const. s[ection] 177. These two constitutional provisions, originating in the fiscal follies of the 19th century, bespeak the same motivating thought. In contrast with the federal constitution, state constitutions ordinarily forbid one generation from stealing the earnings of another, at least without a vote of the people as a whole.

*McGuffey*, 557 S.W.2d at 410-11 (footnotes and some paragraph breaks omitted).

In sum, § 177 "prevent[s] transactions which might result in future liabilities against the general tax revenues of this state and thereby encroach[es] on the freedom of future generations to utilize those resources as they deem appropriate." *Hayes*, 731 S.W.2d at 800.

We need not belabor the point in this already protracted Opinion. The indemnity clauses at issue violate § 177 for the same fundamental reasons they also violate § 50 – they may obligate revenue from future sessions of the General Assembly and thus they impermissibly lend the credit of the Commonwealth. Such a conclusion should not be surprising given that § 50 and § 177 share the "same motivating thought" and work hand-in-glove to "prevent transactions that might result in future liabilities against the general resources of the state . . . ." *McGuffey*, 557 S.W.2d at 411.

-51-

As the trial court aptly noted, the agreements do not contain a

"warning that any future payments are contingent on the willingness of future

legislatures to make appropriations for any claims." In other words, the General

Assembly will have to step in if Retirement lacks sufficient funds, given the

inviolable contract. Moreover, we agree with the trial court that Retirement's

ability to make the potentially staggering indemnity payments is not assured since

the agreements contain "no restrictions whatsoever on the amount of the claims or

the time for bringing such claims. In doing so, they . . . make [Retirement] a surety

in an unlimited amount for the defense costs [Appellants] have incurred and will

incur."[19]

### III.  CONCLUSION

For the foregoing reasons, in Appeal No. 2022-CA-0347-MR, the

Franklin Circuit Court's grant of summary judgment to the Attorney General of

Kentucky on KKR's motion to dismiss is **reversed and remanded** with

---

[19] Briefly, we reject Appellants' arguments that equitable estoppel should lead to a different result. "While it is true that equitable estoppel can be invoked against a governmental entity in unique circumstances, a court must find that exceptional and extraordinary equities are involved to invoke that doctrine." *Sebastian-Voor Properties, LLC v. Lexington-Fayette Urban Cnty. Government*, 265 S.W.3d 190, 194 (Ky. 2008). We conclude these appeals do not present sufficiently unique, exceptional, and extraordinary circumstances for invoking equitable estoppel against a governmental entity. Appellants had the statutory right to file breach of contract actions in the Franklin Circuit Court. Even though Retirement's counsel helped negotiate the indemnity clauses, the agreements explicitly remind the parties that Retirement's obligations are limited by Kentucky law. Thus, even though Retirement's counsel was mistaken about Retirement's indemnification abilities, we perceive nothing so egregious or extraordinary as to warrant applying equitable estoppel here.

instructions to conduct an evidentiary hearing forthwith pursuant to the rubric discussed in *Berthelsen* and *Hinners*, *supra*. After the hearing, the court shall expeditiously issue a new decision. The Franklin Circuit Court is otherwise **affirmed**.

ALL CONCUR.

BRIEFS FOR APPELLANT KKR
& CO., INC:

Barry Barnett
Abigail Noebels
Ryan Weiss
Max Straus
Houston, Texas

Steven Shepard
New York, New York

Seth Thomas Church
Barbara B. Edelman
Grahmn New Morgan
John Moose Spires
Lexington, Kentucky

BRIEFS FOR APPELLANTS
PAAMCO PRISMA, LLC,
PAAMCO/PRISMA HOLDINGS,
LLC AND PRISMA CAPITAL
PARTNERS LP:

David Elbaum
Michael J. Garvey
Peter E. Kazanoff
Sara A. Ricciardi
New York, New York

Seth Thomas Church
Barbara B. Edelman
Grahmn New Morgan
John Moose Spires
Lexington, Kentucky

BRIEFS FOR APPELLEE
COMMONWEALTH OF
KENTUCKY:

Daniel Cameron
Attorney General of Kentucky

Daniel John Grabowski
John Christian Lewis
Victor Bruce Maddox
Alexander Y. Magera
Aaron John Silletto
Brett R. Nolan
Assistant Attorneys General
Frankfort, Kentucky

BRIEFS FOR APPELLANT DANIEL
BOONE FUND, LLC:

Brian Michael Johnson
Carol Anne Stewart
Lexington, Kentucky

BRIEFS FOR APPELLANTS
BLACKSTONE ALTERNATIVE
ASSET MANAGEMENT
ASSOCIATES LLC, BLACKSTONE
ALTERNATIVE ASSET
MANAGEMENT L.P., AND
BLACKSTONE HENRY CLAY
FUND, LLC:

Andrew J. Ehrlich
Brad S. Karp
Lorin L. Reisner
Brette Tannenbaum
New York, New York

Donald Joseph Kelly
Jordan Michael White
Louisville, Kentucky

*AMICI CURIAE* BRIEF FOR LAW
PROFESSORS:

Christopher D. Belelieu
New York, New York

Michael W. Oyler
Louisville, Kentucky